### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

               **Plaintiff,**

        **v.**

GERALD H. LEVINE, et al.,

               **Defendants.**

        **Civil Action 99-02568  (HHK)**

### MEMORANDUM

Defendants Gerald and Marie Levine were found by a jury to have violated the following provisions of federal securities law: § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; §§ 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); and § 13(b)(5) of the Exchange Act, *id.* § 78m(b)(5), and Rule 13b2-1 promulgated thereunder, 17 C.F.R. § 240.13b2-1.  The second amended complaint filed by the Securities and Exchange Commission ("the Commission") alleged that the Levines had violated securities laws by fraudulently overstating the assets of CEC Industries Corporation ("CEC"), profiting from illicitly selling CEC shares, failing to implement a system of internal accounting controls at CEC, and knowingly falsifying its books, records, accounts, and reports filed with the Commission.

After trial, this court conducted a hearing on remedies, at which the Commission sought (1) an injunction against future violations of federal securities laws; (2) a permanent bar prohibiting the Levines from acting as officers or directors of any issuer that has a class of securities registered pursuant to § 12 of the Exchange Act or that is required to file reports pursuant to § 15(d) of the Exchange Act; (3) civil penalties amounting to $540,000; and (4) disgorgement of ill-gotten gains of approximately $536,289 plus prejudgment interest of $524,582, for a total of $1,060,871.

Based on the evidence presented, the court makes the following:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.   **THE LEVINES MADE NUMEROUS FALSE STATEMENTS REGARDING THE VALUE OF INTERESTS HELD BY CEC**

    A.   **The Levines Falsely Overstated the Value of Two CEC Subsidiaries**

1.   In or about 1993, defendants controlled a company called OTS Holdings ("OTS"), which acquired the two entities that are central to this case: Basia Holdings and Mid-Nevada Art. G. Levine Test. at 58:9–59:8.  OTS's filings with the Commission from that era, which the Levines signed, state that Basia Holdings "owned" 9,000 acres of "valuable" land in Tennessee and Mid-Nevada Art owned paintings by the artist known as Sky Jones.  Ex. KKK at 4–5.[1]

2.   Three years later, in 1996, defendants structured a transaction by which OTS exchanged its ownership of Basia and Mid-Nevada for a controlling interest in CEC.  Ex. 1 at 20; Ex. 10.4 to Ex. 1 (CEC/OTS Agreement, March 28, 1996); G. Levine Test. at 60:5–25.

---

[1] Defendants have designated their exhibits using letters; all numbered exhibits have been submitted by the Commission.

3.      In 1996 and 1997, defendants signed and filed with the Commission annual and

quarterly reports for CEC.  Defendants therein falsely claimed that CEC "owned" 9,000 acres of

land in Grundy County, Tennessee, that contained valuable deposits of coal and harvestable

timber, *see, e.g.*, Ex. 1 at 2, 5; Volume II, Trial Transcript ("Trial Tr.") at 47:21–48:18, and that

its inventory of Sky Jones paintings was worth approximately $1.7 million, Ex. 1 at 5; Trial Tr. II

at 48:19–24.

### 1.      Ownership of Land in Tennessee

4.      Commission witness J. Harvey Cameron, a lawyer who practices in Grundy

County, was qualified by the court to offer an opinion on the validity of CEC's claim to

ownership of the Tennessee land.  He testified that CEC did not own the land, and he explained

that other persons maintained residences and businesses on the entirety of this land and had paid

real estate taxes on all of it for several years before CEC obtained any interest in it.  Trial Tr. II at

134:12–160:25.

5.      Defendants did not introduce any evidence at trial or at the remedies hearing that

contradicted Cameron's testimony that CEC did not own the Tennessee land.  Indeed, Gerald

Levine, testifying for the first time in these proceedings at the remedies hearing, stated that "[i]t

was never our intention to own the land in Tennessee.  It was only our intention to have the

mineral rights."  G. Levine Test. at 64:6–7.[2]  CEC's forms 10-K and 10-Q, filed and signed by

the Levines in 1996 and 1997, however, state that the CEC subsidiary, Basia Holdings, "owns

approximately 9,000 acres of land . . . in Grundy County Tennessee."  Ex. 1 at 8; *see also id.* at 5.

---

[2] Gerald Levine also testified that defendants "could prove" that CEC owned the mineral
rights to the Tennessee land.  G. Levine Test. at 66:14–17.  Defendants nonetheless offered no
such proof at trial or at the remedies hearing.

Those documents also refer to the Tennessee land as "fee" land, a reference commonly used to indicate complete ownership. *Id.* at 2; *see also id.* at 5.

### 2.    Valuation of the Sky Jones Paintings

6.    Commission witness C. Van Northrop is a professional art appraiser who was qualified to offer an opinion on the value of the Sky Jones paintings. Northrop testified that these paintings were worth approximately $10,000, not the $1.7 million that defendants represented to investors that they were worth in CEC's reports to the Commission. Trial Tr. III at 92:5–10; 106:11–115:8.

7.    Defendants did not offer any evidence at trial that contradicted Northrop's opinion that the Sky Jones paintings had only nominal value. Gerald Levine did state that defendants had relied on Generally Accepted Accounting Principals ("GAAP") to value the paintings and the land. G. Levine Test. at 86:8–87:2. Defendants, however, did not show at trial or at the remedies hearing that the assets were correctly valued according to GAAP, or that GAAP was even relevant to the question of the value of the purported interest in the Tennessee land or the Sky Jones paintings.

### B.    The Levines Made the False Statements With Reckless Disregard for Their Veracity

8.    By determining that the Levines violated § 10(b) and Rule 10b-5, the jury found that the Levine's fraudulent statements were made at least recklessly as to their falsity, if not knowingly. *See* Jury Verdict Form [#169]; *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) (holding that no "private cause of action for damages will lie under § 10(b) and Rule 10b-5 in the absence of any allegation of 'scienter'— intent to deceive, manipulate, or defraud").

## II.   THE COMMISSION HAS PARTIALLY MET ITS BURDEN TO REASONABLY APPROXIMATE THE AMOUNT BY WHICH THE LEVINES UNJUSTLY ENRICHED THEMSELVES VIA THE SALE OF ARTIFICIALLY INFLATED CEC STOCK

9.   The court now turns to the Commission's request for disgorgement.  The court possesses power to order the defendants to disgorge fully the ill-gotten gains of their fraudulent activities.  *See, e.g., SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996); *SEC v. Hasho*, 784 F. Supp. 1059, 1111 (S.D.N.Y. 1992).

10.   "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating [federal] securities laws."  *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989).  The Commission need establish only "a reasonable approximation of profits causally connected to the violation" to establish the amount of disgorgement that it may claim.  *First Jersey Sec.*, 101 F.3d at 1475 (citation and internal quotations omitted).  The burden then shifts to defendants "clearly to demonstrate that the disgorgement figure [is] not a reasonable approximation."  *First City Fin.*, 890 F.2d at 1232.  "Any risk of uncertainty in calculating disgorgement should fall on the wrongdoer[s] whose illegal conduct created that uncertainty."  *First Jersey Sec.*, 101 F.3d at 1475 (citation and internal quotations omitted); *see also First City Fin.* at 1232.

11.   The gravamen of the Commission's request for disgorgement is that the Levines profited from the sale of fraudulently inflated CEC stock.  The Commission contends that the Levines directed a private company they controlled, Wire to Wire Inc. ("Wire to Wire"), to sell CEC stock and then funneled the proceeds of these sales to themselves through Wire to Wire's accounts.  The Commission also contends that the Levines similarly enriched themselves with stock proceeds held by their lawyer, Alvin Green, and their daughter, Lisa Levine.  In assessing

the Commission's disgorgement request, the court will first address the relationships among the
Levines, Wire to Wire, and CEC, and then will address the Commission's approximation of
alleged profits from the Levines' fraudulent activities.

### A.    Wire to Wire Inc.

12.     As noted, Wire to Wire is a private company.  Since late March, 1996, Gerald
Levine has been its president and Marie Levine its secretary-treasurer.  G. Levine Test. at
31:22–31:24, 42:11–13; M. Levine Dep., November 20, 2002 ("M. Levine Dep. II") at
352:10–19.  According to Gerald Levine, Wire to Wire focuses on helping troubled companies.
G. Levine Dep., Nov. 7, 2006 ("G. Levine Dep.") at 42:6–43:8.  Mr. Levine began helping
troubled companies early in his career.  G. Levine Test. at 57:25–58:9.

### 1.    Wire to Wire's relationship with CEC

13.     On April 1, 1996, immediately after gaining control of CEC and Wire to Wire, the
Levines caused CEC to sign an agreement with Wire to Wire under which Wire to Wire would
provide CEC with management personnel and other qualified technical support. Ex. BBBBB
(CEC 1997 10-K) at 19.

14.     On May 30, 1996, the Levines filed a Form S-8 Registration Statement on behalf
of CEC, registering the issuance of 762,136 shares of its common stock to "Employees, or
Consultants of the Company, whether individual or corporate."  Ex. HHHHH (Form S-8, May
30, 1996) at 16.  Pursuant to the Form S-8 Registration Statement, Wire to Wire was issued
shares of CEC common stock, some of which the Levines caused to be sold in calendar year
1996.  G. Levine Test. at 48:4–25; Ex. BBBBB at 20.

15.     On October 8, 1996, the Levines filed another Form S-8 Registration Statement on behalf of CEC, registering the issuance of 755,000 shares of its common stock to "compensate officers, directors, consultants and certain other persons providing bona fide services to the Company, through the award of C.E.C.'s common stock."  Ex. IIIII (Form S-8, October 8, 1996) at 14.  Wire to Wire may have received CEC shares pursuant to this Registration Statement.  G. Levine Test. at 48:4–25.

### 2.     Wire to Wire's relationship with the Levines

16.     The sole shareholder of Wire to Wire is Yonus Development ("Yonus"), a company organized and incorporated under the law of the British Virgin Islands.  *Id*. at 31:22–32:3.

17.     Defendants claim not to know who owns Yonus.  *Id.* at 32:24–25.  Moreover, Gerald Levine testified that he does not know today who is the managing director of Yonus or where it is located.  *Id.* at 91:23–92:3.  The Levines continue to operate Wire to Wire today.  *Id.* at 31:22–24.  While Yonus may be Wire to Wire's sole shareholder, Yonus exerts no visible control over Wire to Wire's operations.  Since approximately 1999, defendants have not had any contact with a Yonus representative.  M. Levine Dep. II at 452:4–16; G. Levine Dep. at 36:10–37:17.  Gerald Levine claimed at the remedies hearing that Alvin Green was the U.S. agent for Yonus, and that the two men spoke frequently during 1996 and 1997, though not necessarily regarding Yonus or its interests in Wire to Wire.  G. Levine Test. at 34:7–24; 36:7–37:2.

18.     In her second deposition, Marie Levine testified that she and her husband have not been in contact with any Yonus representative since about 1999.  M. Levine Dep. II at 451:19–452:19; 453:21–454:25.

19.     In her third deposition, however, she testified that Michael Barth, the former Switzerland-based managing director of Yonus, had repaid them "about half" of a $500,000 loan between 1996 and 2002 or 2003.  M. Levine Dep., September 22, 2003 ("M. Levine Dep. III") at 600:25–604:11.  Ms. Levine admitted that when she prepared the Levines' joint personal tax returns, she did not treat these loan repayments as "taxable income."  *See* M. Levine Dep. III 671:13–674:20; 588:11–600:1 (discussing tax year 2000 "reimbursements"), 602:4–605:6 (discussing tax year 1999 "reimbursements"), 607:25–610:13 (discussing 1998 "reimbursements"), 610:21–614:2 (discussing 1997 return), 614:8–616:16 (discussing the 1996 return).  She alleged that she no longer possessed the records of this loan transaction or any details of its repayment and that she had previously given them to Green, who had lost them.  *See* M. Levine Dep. III at 601:25–604:14, 599:12–600:2.

20.     Ms. Levine elsewhere testified, however, that Wire to Wire was the borrower and Yonus the lender of $500,000.  M. Levine Dep. II at 447:17–451:8.

21.     This inconsistent testimony casts doubt on Marie Levine's credibility and raises serious questions as to whether the claimed loan took place between the Levines and Yonus.

22.     Gerald Levine testified at the remedies hearing that Green was functional even after he had a stroke in 1998, including signing papers to release a lien on the house owned by Wire to Wire in which the Levines lived.  G. Levine Test. at 37:16–38:8, 53:14–54:3.  Marie Levine testified in her April 2002 deposition, however, that Green could not remember anything

about Wire to Wire records given to him for safekeeping, and was incapable of even remembering his own address.  M. Levine Dep., Apr. 24, 2002 ("M. Levine Dep. I") at 25:2–21. She further testified in November 2002 that Green "was unable to function as a businessperson," and had been in that state since 1998 or 1999.  M. Levine Dep. II at 451:19–452:3.  These inconsistencies cast further doubt upon the Levines' credibility.

23.     As Wire to Wire's only officers and directors, the Levines possessed and continue to possess authority to act on behalf of Wire to Wire, as Nevada's corporation law provides. Thus, they have the power to enter contracts, open brokerage and bank accounts, and direct the disposition of assets in those accounts.  G. Levine Test. at 71:17–72:2, 72:14–19 (Levines control Wire to Wire's bank accounts), 72:20–73:4 (Levines control Wire to Wire brokerage accounts). No person other than the Levines possesses that authority over Wire to Wire's accounts. G. Levine Test. at 72:7–73:8; G. Levine Dep. at 32:21–34:1.

### 3.     The Levines' finances and use of Wire to Wire accounts

24.     The Levines' federal income tax returns for 1996 and 1997 raise substantial doubt as to whether their reported taxable income could cover their living expenses for those years. *See* Exs. 280–84.

25.     At trial, the Commission played a videotape of excerpts from two of Marie Levine's three depositions.  Ex. 248.  Ms. Levine there explained that she and Mr. Levine supported themselves from gambling winnings.  *Id.* at 4 (M. Levine Dep. I at 66:7–69:3).  At the remedies hearing, Mr. Levine also testified on this point.  G. Levine Test. at 88:22–89:4.  In her September 22, 2003 deposition, the Commission asked Ms. Levine about the personal tax returns that she and Gerald Levine filed for 1996 through 2001.  M. Levine Dep. III at 583:22–619:23

9

and Exs. 280–84.  Ms. Levine admitted that she had prepared and filed the tax returns for those

years.  *See* M. Levine Dep. III at 585:6–22; 591:12–592:18; 600:3–602:6; 606:11–607:20;

610:21–611:15; 614:7–615:4.  On each return, defendants' gambling losses essentially set off

their gambling winnings:

| Year | Gambling Winnings | Gambling Losses | Taxable Income |
|------|-------------------|-----------------|----------------|
| 1996 | $62,076 | $38,076 | $21,531 |
| 1997 | $151,821 | $127,821 | $24,607 |
| 1998 | $238,988 | $238,988 | $9,476 |
| 1999 | $138,451 | $126,451 | $18,690 |
| 2000 | $215,443 | $215,443 | $25,355 |
| 2001 | $65,484 | $65,484 | $7,043 |

*See* Ex. 280 (1996 Form 1040 and Other Income Schedule (reporting gambling income from

Form W-2G) and Schedule A, Miscellaneous Itemized Deductions Statement, line 17 (reporting

gambling losses); Ex. 281 (1997 Form 1040); M. Levine Dep. III at 610:22–612:7 (identifying

$127,821 as income from gaming), 613:5–8 (confirming that gambling income was precisely set

off by gambling losses); Ex. 282 (1998 Form 1040, Line 21 reporting income from Form W-2G);

Ex. 283 (1999 Form 1040 Other Income Statement and Schedule A); Ex. 284 (2000 Form 1040,

line 21 reporting gambling winnings (Form W-2G), and Schedule A, reporting gambling losses).

26.     Ms. Levine testified that, from time to time, she and her husband paid $2,000 as

monthly rent to Wire to Wire, the owner of their home.  Ex. 248 at 1 (M. Levine Dep. I at

8:18–9:3). For each year from 1996 to 2001, defendants failed to report sufficient taxable income

to pay Wire to Wire that rent.

10

27.     Ms. Levine admitted that she might have used funds from Wire to Wire's account to pay defendants' individual income tax, the utilities for their house, business meals and travel, and some medical expenses.  M. Levine Dep. III at 667:23–668:25; 670:1–674:4; *see also* M. Levine Dep. I at 65:20–70:3.  She admitted that she did not report the referenced payments on their federal income tax returns for 1996 and 1997.  M. Levine Dep. III at 671:13–674:20.  Wire to Wire also supplied an automobile to Ms. Levine.  *Id.* at 613:9–614:2.

28.     Ms. Levine also testified that the Levines paid personal expenses from Wire to Wire's bank account in 1996.  Ex 248 at 3–4 (M. Levine Dep. I at 65:20–66:6); M. Levine Dep. III at 671:13–674:20.   For example, she admitted intermingling of personal and Wire to Wire funds.  *See* M. Levine Dep. II at 345:17–346:23**.**  She also admitted that she frequently deposited her gambling winnings in Wire to Wire's checking account.  In her words, "It happened a lot." Ex. 248 at 4–5 (M. Levine Dep. I at 67:9–19).

29.     In light of the evidence that the Levines' gambling losses offset their gambling winnings, Marie Levine's testimony that she reimbursed Wire to Wire for payments of personal expenses from gambling winnings is not credible.  *See* M. Levine Dep. I at 69:1–8.  The self-serving and often false testimony about reimbursements supports an inference that defendants used Wire to Wire accounts in 1996 to provide for their personal living expenses.

30.     In early 2003, the Levines requested that the Internal Revenue Service (IRS) provide them with copies of Wire to Wire's 1996 and 1997 corporate income tax returns.  By letter dated April 11, 2003, the IRS stated that it had no record of Wire to Wire filing corporate tax returns for those years.  *See* M. Levine Dep. III at 620:19–621:21, Ex. 7; Ex. 285.  In explanation of the IRS's letter, Marie Levine insisted that she filed Wire to Wire's returns for

those years and gave her only copies to Green, who lost them.  *See* M. Levine Dep. III at 622:18–625:6.

31.     The evidence that Wire to Wire's corporate tax returns are nonexistent casts further serious doubt upon the Levines' credibility and supports an inference that defendants used Wire to Wire to sustain their lifestyle.

32.     Finally, the evidence that Wire to Wire paid the Levines no salary, G. Levine Test. at 41:8–42:9, but that the Levines frequently wrote themselves checks from Wire to Wire's accounts, *see* Part II.C.2.a(ii), *infra*, further supports a finding that defendants used Wire to Wire to sustain their lifestyle.

### 4.      Conclusions regarding the Levines and Wire to Wire

33.     For purposes of this proceeding, the court concludes the owner of Yonus exercised little, if any, influence or control over defendants' management of Wire to Wire.  Thus, only the Levines control it, and at all times relevant to this suit, they did so without respecting corporate formalities.

34.     The evidence shows that Wire to Wire was the vehicle through which defendants perpetrated and profited from their fraud.  The court determines that the Levines made extensive use of Wire to Wire for personal purposes.  Accordingly, the fact that some proceeds from CEC stock sales flowed into Wire to Wire accounts, rather than to accounts held in the Levines' names, does not give rise to an inference that the Levines did not obtain, use, or profit from those proceeds.  To the contrary, the inference arises that, in light of the Levines' control over Wire to Wire and use thereof for personal purposes, such proceeds may have been obtained and used by the Levines for personal enrichment.  *See First Jersey Sec.*, 101 F.3d at 1475.

**B.**     **Sales**

35.     The court now turns its attention to the proceeds of CEC stock sales and the Commission's attempt to show that the Levines profited therefrom.

36.      While they were making material misrepresentations about the value of CEC's interest in the Tennessee land and the Sky Jones paintings, defendants sold shares of CEC stock.

37.     The Commission has attempted to support its request for disgorgement by "tracing" CEC stock proceeds received by Wire to Wire, Green, and Lisa Levine to accounts held by, held in favor of, and/or controlled by the Levines.  The Commission has also attempted to approximate the Levines' unjust enrichment by assessing the disbursement of funds from these accounts to determine whether the Levines benefitted personally from the CEC stock proceeds. The court will assess the Commission's request on an account-by-account basis.

38.     This assessment begins, naturally, with the original sales of CEC stock.  The Commission's witness, John Salomon, summarized defendants' 1996 sales of CEC stock.  He stated that those sales generated revenues in four brokerage accounts in the approximate amount of $714,351.  Trial Tr. III at 155:6–157:2 (discussing Ex. 245); J. Salomon Test., Dec. 4. 2006 ("J. Salomon Hr'g Test.") at 29:22–31:6; Ex. 251, Sched. 2 ("Sched. 2") (total of proceeds of selling CEC stock in four brokerage accounts).

39.     Defendants have never disputed that their 1996 sales of CEC shares generated these proceeds.

**1.**     **Pacific International Securities Wire to Wire Account**

40.     In 1996, Gerald Levine made the decision to sell shares of CEC stock in Wire to Wire's account at Pacific International Securities.  G. Levine Test. at 72:14–73:4; Ex. 248 at 6

(M. Levine Dep. I at 59:13–59:23).  The proceeds from these sales through November 1996

totaled $371,209.  Sched. 2; J. Salomon Hr'g Test. 30:20–22.

### 2.      Public Securities Wire to Wire Account

41.      Both Gerald and Marie Levine had signature authority over a separate account in

Wire to Wire's name at Public Securities.  G. Levine Test. at 72:20–73:4; Ex. 248 at 9

(M. Levine Dep. II at 565:2–565:13).  CEC stock proceeds from 1996 sales in this account,

which were directed by the Levines, totaled $186,153.  Sched. 2; Ex. 248 at 5 (M. Levine Dep. I

at 79:5–25).

### 3.      Pacific International Securities Alvin Green Account

42.      Pursuant to the aforementioned May 1996 Form S-8 Registration Statement,

Green was issued shares of CEC common stock, some of which he subsequently sold in calendar

year 1996.  Ex. HHHHH; Sched. 2; G. Levine Test. at 48:4–25.  CEC stock proceeds from 1996

sales in this account amounted to $130,468.  In November 1996, Green authorized Gerald Levine

to withdraw money and securities from Green's account at Pacific International Securities.

M. Levine Dep. I. at 172:20–177:10; Ex. 248 at 10 (M. Levine Dep. II at 506:10–508:16).

### 4.      Pacific International Securities Lisa Levine Account

43.      CEC stock proceeds from 1996 sales in a fourth account, held at Pacific

International Securities in the name of Lisa Levine, amounted to $26,251.  Sched. 2.  These sales

were likely directed by the Levines.  Ex. 248 at 5 (M. Levine Dep. I at 79:5–25).

### 5.      Summary

44.      Defendants' sales of CEC shares appear in the far left column of Schedule 2 in

Salomon's January 13, 2005 report.  *See* J. Salomon Hr'g Test. at 28:1–29:3; Sched. 2.  That data

is derived from records of the Canadian brokerage accounts that defendants opened and controlled. It shows that the Levines directed the sales of CEC shares totaling approximately $714,351. J. Salomon Hr'g Test. at 29:22–31:6.

**C.      Disbursements**

45.      After the CEC stock sales, the proceeds flowed into various accounts, as follows:

**1.      Intermediate Accounts**

46.      Of the $186,153 in CEC proceeds in the Public Securities Wire to Wire account, the Levines directed the transfer of $184,408 to another Wire to Wire account, held at Sun State Bank. Ex. 245; J. Salomon Hr'g Test. at 32:3–6.

47.      Of the $371,209 in CEC proceeds in the Pacific International Securities Wire to Wire account, the Levines directed the transfer of $77,705 to the client trust account of Green's law firm. Ex. 245; J. Salomon Hr'g Test. at 32:13–17.

48.      Of the $371,209 in CEC proceeds in the Pacific International Securities Wire to Wire account, the Levines directed the transfer of $236,907 to the Wire to Wire account held at Sun State Bank. Ex. 245; J. Salomon Hr'g Test. at 31:20–32:2.

49.      As noted above, in November 1996, Green authorized Gerald Levine to withdraw money and securities from Green's account at Pacific International Securities. M. Levine Dep. I. at 172:20–177:10; Ex. 248 at 10 (M. Levine Dep. II at 506:10–508:16).

50.      On November 6, 1996, Gerald Levine directed the transfer of $74,701 (of $130,468) in CEC stock proceeds from Green's Pacific International brokerage account to his law firm's client trust account. Ex. 248 at 7 (M. Levine Dep. I at 175:14–176:9).

51.     The Levines directed the transfer of $24,900 (of the $26,521 in CEC proceeds) from the Lisa Levine brokerage account to a Bank of America account held in the names of Gerald and Brad Levine.  Ex. 245; Ex. 248 at 5 (M. Levine Dep. I at 79:5–15).

### 2.     Disbursements

52.     The Commission alleges that after transferring the disputed funds to these intermediate accounts, defendants then disbursed the funds to themselves, through a variety of means.  For the period from November 1, 1996 to January 1, 1997, Salomon estimated that defendants received benefits totaling approximately $299,382.  Ex. 245; Ex. 251, Sched. 5 ("Sched. 5").  In reaching this figure, Salomon traced payments from the four brokerage accounts to three bank accounts.  Defendants controlled two of these bank accounts.  G. Levine Test. at 71:17–72:2, 72:14–72:19.  In the third account, the Green & Krupp Client Trust Account, Green set up a certificate of deposit in trust for Gerald and Marie Levine.  M. Levine Dep. I at 36:4–37:2; s*ee also* Ex. 245, Ex. 251 at 5–6 and Scheds. 1, 2.

53.     These proceeds fall into three categories.  First, for the period of November 1, 1996 through December 31, 1996, Salomon traced proceeds of $123,780 from the referenced brokerage accounts to bank accounts over which the Levines had signature authority.  With respect to these accounts, he found checks that defendants wrote to themselves and to others.  J. Salomon Hr'g Test. at 38:12–39:2; Ex. 251 at 5–6; Sched. 2.

54.     Second, in April 1996, he found an additional $23,200 in three cashier's checks drawn on the Brad Levine/Gerald Levine bank account at Bank of America.  J. Salomon Hr'g Test. at 41:4–17.  He traced the proceeds in that account to sales of CEC stock in the "Lisa

Levine" brokerage account that defendants also controlled.  *See* J. Salomon Hr'g Test. at 33:9–17; Sched. 2.

55.     Third, Salomon traced over $150,000 in CEC proceeds to the certificate of deposit held in trust for the Levines.  M. Levine Dep. I at 36:4–37:2; s*ee also* Ex. 245, Ex. 251 at 5–6 and Scheds. 1, 2.

56.     In addition to these transactions, for the period of June 1, 1996 through October 22, 1996, Salomon found that the Levines directed the sale of an additional $236,000 of CEC stock and directed the proceeds to Wire to Wire checking accounts over which defendants alone had signature authority.[3]  *See* J. Salomon Hr'g Test. at 31:14–25; Sched. 5.  With respect to this amount, however, he could not trace how defendants disbursed those funds because defendants never produced checks for this period to the Commission.  *See* J. Salomon Hr'g Test. at 40:10–19.

57.     The Commission asserts that the amounts in these four categories, a total of $536,289, constitute a "reasonable approximation" of defendants' illicit profit from their sales of CEC's shares.  *See* Ex.  251, Sched. 5.  The court will address each category of claimed disbursements separately.

### a.     Identified disbursements from the Sun State account in November and December 1996

58.     As previously explained, evidence in the record of this case shows that defendants controlled the cash that accrued to Wire to Wire's accounts, commingled personal and Wire to Wire funds therein, and used the accounts for their personal benefit.

---

[3] The Commission sought these records in its investigation of CEC Industries Corp. and in discovery in this action.  Defendants did not produce them.  Marie Levine testified that she gave all Wire to Wire records to Green.  M. Levine Dep. III at 624:3–625:6.

59.     The weight of evidence supports the Commission's claim that defendants likely benefitted from the proceeds of CEC stock sales that flowed into Wire to Wire accounts. The Levines are admittedly sophisticated business people. Marie Levine has many years of experience in bookkeeping for public companies. The court does not credit defendants' repeated claims that they never memorialized significant agreements in writing, that records of their activities (which they imply would prove the Commission wrong) are missing, or that others, who are unable to testify, lost those records. Further, defendants' lack of cooperation in discovery in this case supports an inference that they are responsible for any lost records and that any loss of records constitutes a deliberate effort to conceal their conduct.

60.     For all these reasons, it would be appropriate to conclude that *any* CEC proceeds flowing into accounts held by Wire to Wire unjustly enriched defendants. By directing these funds to accounts which they alone controlled, and which they frequently (if not primarily) used for personal purposes, defendants obtained the funds and were personally enriched thereby from the moment of receipt. That they may have thereafter spent these proceeds on Wire to Wire's behalf in pursuit of "legitimate" business aims is irrelevant. *First Jersey Sec.*, 101 F.3d at 1475 (observing that the risk of uncertainty in calculating disgorgement should fall on the wrongdoer); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 15–16 & n.14 (D.D.C. 1998) (in a suit against both a corporate body and its controlling person, rejecting argument that the disgorgement figure should be reduced because fraudulently obtained funds were spent for legitimate business purposes); *SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 n.21 (E.D. Mich. 1991) ("Plaintiff is not required to trace every dollar or proceeds misappropriated by the defendants . . . , nor is plaintiff required to identify misappropriated monies which have been commingled by

them."). It is likewise irrelevant that the Commission did not definitively show that certain funds arrived in accounts held in the Levines' names. For purposes of approximating defendants' unjust enrichment, and properly resolving evidentiary ambiguities against defendants, the court could deem the Commission's bare showing that the CEC funds flowed into accounts that defendants both controlled and frequently used for personal purposes a reasonable approximation of the Levines' ill-gotten gains.

61.     To make this determination is not to pierce the corporate veil or impose punishment based upon an alter ego theory of liability. To the contrary, the Commission's burden, and the court's ultimate duty, is merely to approximate profits obtained by the Levines based upon the evidence presented. Subsequent to this approximation, the burden falls on defendants to show that the approximation is unreasonable. This burden-shifting determination operates upon principles of equity to require disgorgement of gains wrongfully obtained, by whatever means, and does not reach into the coffers of any third party or non-defendant entity.

62.     Notwithstanding the foregoing considerations, the court will not order disgorgement of all proceeds received by Wire to Wire, because such an order has not been requested. Instead, the court will, in the exercise of its discretion, approach the question on the basis posited by the Commission. That is, the court will order disgorgement based on a reasonable approximation of stock proceeds shown to be received by the Levines *personally*, as opposed to indirectly via Wire to Wire's receipt of those proceeds.

### (i)      The Commission's approximation

63.     Salomon testified at the remedies hearing that during November and December 1996, the Levines deposited $184,408 in CEC stock sale proceeds into Wire to Wire's account at

Sun State Bank.  J. Salomon Hr'g Test. at 32:3–6.  He also testified regarding his analysis of the disbursements the Levines made from that account during those same months.

64.     First, Salomon identified disbursements made from the Sun State account to defendants, cash, and to parties related to the Levines (i.e., CEC, Green, etc.) shortly after those proceeds were deposited in the account (his analysis was limited to November and December 1996).  *Id.* at 33:19–34:11.  He also identified expenditures made that he viewed as "questionable," that is, likely for personal rather than legitimate business purposes.  *Id.* at 33:19–34:1; 39:22–40:9.

65.     Because the CEC proceeds constituted only a fraction of the cash available in the Sun State account — CEC proceeds accounted for 79% and 31% of the available cash in November and December, respectively —  Salomon used these fractions to approximate the percentage of these disbursements that could be "traced" to the CEC proceeds.  *Id.* at 33:19–34:11.  Thus, where a disbursement was made to the Levines, to a related party, or for questionable expenditures in November, he multiplied that disbursement by 79% to roughly approximate the percentage of that disbursement traceable to the proceeds.  He multiplied December expenditures by 31%. Ex. 251 at 5; J. Salomon Hr'g Test. at 37:9–38:24.

66.     The court finds that this approach, while certainly somewhat inexact, reasonably approximates defendants' personal profits from the November/December proceeds.  *First City Fin.*, 890 F.2d at 1231 ("Rules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task."); *see also* J. Salomon Hr'g Test. at 39:14–21.  The court must now determine whether the Levines profited from each of the identified disbursements.

67.     The court first accepts the Commission's assertion that checks payable to defendants and cash constitute ill-gotten profit.  The Levines therefore must disgorge **$22,270**.

68.     The court next rejects the Commission's assertion that checks payable to CEC, Time to Buy Inc., and Alvin Green constitute ill-gotten profit.  While the Commission has presented ample evidence that the Levines misused Wire to Wire's accounts and funds (such that the court may infer, in the absence of contrary evidence, that the Levines enriched themselves from those funds and accounts), it has not presented concomitant evidence regarding monies held by Time to Buy Inc., CEC or Green.

69.     Third, the court finds that the expenses labeled "questionable" by Salomon were, more likely than not, expenses that enriched the Levines personally.  *Id.* at 40:1–4.  Given the Levines' proven history regarding their use of Wire to Wire and their failure to meaningfully rebut Salomon's testimony, the court resolves, with little trouble, the slight ambiguities inherent in the evidence in favor of the Commission.  Additionally, as explained more fully below, many (if not all) of these expenditures bear indicia of being connected to the CEC stock proceeds.  The Levines must therefore disgorge **$8,295**.

70.     Fourth, in November 1996, two checks totaling $100,000 were written from the Sun State Wire to Wire account, payable to Wire to Wire.  Ex. EEEEE Attach. ("Olson Reconciliation") at 5.  Applying the 79/100 fraction discussed above, Salomon identified **$79,000** of these transferred funds as being traceable to CEC stock proceeds.  Ex. 251 at 5–6; Sched. 5; J. Salomon Hr'g Test. at 39:5–21.

71.     For these two checks, the Commission did not approximate with any detail whether the proceeds were received by the Levines personally.  While in other contexts, this lack

of evidence might constitute a failure to carry the Commission's burden to approximate profits received, it does not constitute such a failure here because this court draws an inference against the Levines from their use of Wire to Wire and their failure to cooperate in discovery regarding Wire to Wire's records.  Considering all the evidence, the court determines that it is not unreasonable to approximate the ill-gotten profits received by the Levines from these two transfers at 79% and shift the burden to the Levines to show clearly that the approximation is not justified.

### (ii)    Defendants' evidence against the Commission's approximation

72.    The Levines' showing against the Commission's approximation is largely unpersuasive.  For many of the disbursements, defendants rest on the assertion, which they attempted to elicit from Salomon, that it is equally as likely that they were for legitimate purposes as it is that they were made to provide the Levines with unjust profit from the CEC proceeds.  *See*, *e.g.*, Defs.' Prop. Findings ¶ 49.  It is not the Commission's burden to *prove* that the Levines collected the proceeds (and did so improperly) — the burden is to *approximate* their profits, and ambiguities are to be resolved in the Commission's favor.  *First Jersey Sec.*, 101 F.3d at 1475; *Great Lakes Equities Co.*, 775 F. Supp. at 214 n.21.  Moreover, the timing and attributes of the disbursements, which correlate to a short period of time during which the CEC proceeds constituted a significant percentage (in November, a large majority) of deposits, support an inference that the Levines made at least many of the disbursements for the purpose of collecting ill-gotten profits from their fraudulent conduct.

73.     For example, as of November 1, 1996, the balance in the Sun State account appears to have been $16,415.  Ex. EEEEE Attach. at 5 ("Olson Reconciliation").[4]  Between November 1 and 5, the Levines wrote five checks: four to themselves amounting to $3,000, and one to American Express for $1,444, leaving a balance of $11,971 as of November 6.  *Ibid.*

74.     On November 6, 1996, a day after defendants directed Wire to Wire to sell $49,166 of CEC stock, they transferred $30,000 into the Sun State Wire to Wire account.  Within five days of this deposit, they wrote a $500 check to Alvin Green, a $7,000 check to CEC, and $2,000 in checks to themselves.  *Id.* at 6.  (During this period, on November 7, they also transferred (in two transactions) $152,406 from brokerage accounts to the Green & Krupp client trust account.  *Ibid*.  These transactions are discussed below.)

75.     On November 12, defendants deposited $105,203 in CEC stock proceeds into the Sun State Wire to Wire account.  *Ibid.*; Sched. 2.  The next day, they wrote an $85,000 check to Wire to Wire.  Olson Reconciliation at 6.  Over the course of the next two weeks, they wrote themselves numerous checks, totaling $18,500.  *Ibid*.  They also wrote an $895 check to Fletcher Jones (a "questionable" expenditure) and checks totaling $5,000 to CEC.  *Ibid.*  They also wrote another check to Wire to Wire for $15,000.  *Ibid.*  (The two checks to Wire to Wire are the basis for the Commission's request for $79,000 in disgorgement).

76.     Thus, on November 6 and 12, defendants placed $135,203 in CEC proceeds into the Sun State Account.  Within that same month, disbursements to themselves, to Wire to Wire, and for questionable expenditures from that account amounted to $119,395 ($895 + $18,500 + $100,000), nearly accounting for all of the CEC deposits.  When disbursements to CEC (which

---

[4] On October 22, 2006, $48,000 was transferred into the account from one of the brokerage accounts.  Olson Reconciliation at 4.

the court does not require to be disgorged but are nonetheless suspicious) are included in the calculation, the disbursements total $131,395, an even closer match to the deposits.

77.     December activities tell a similar story.  On December 1, 1996, the balance in the Sun State account appears to have been $8,442.  *Id.* at 7.  On December 2, defendants transferred $31,927 in CEC proceeds into the account.  *Ibid.*  That same day, they wrote checks worth $9,743 for questionable expenditures and wrote a $7,000 check to CEC.  *Ibid.*

78.     The following day, they wrote a $1,000 check to Marie Levine.  *Ibid.*

79.     Two days later, they transferred $17,278 in stock proceeds to the account.  *Ibid.* (On this date, the certificate of deposit held in trust for the Levines was created.  *Ibid.*)  The day immediately following the deposit, they wrote two checks to themselves totaling $3,000.  *Ibid.*

80.     Within a week, they wrote three more checks to themselves, totaling $4,000.  *Ibid.*

81.     During the remainder of the month, they wrote eight checks to themselves (totaling $6,500), one check to a company they control (Time to Buy Inc.) for $1,000, another for $7,680 to American Express (a "questionable" expense), and a final check to CEC for $6,000. *Ibid.*  The month-end balance in the account was $19,212.

82.     Thus, on December 2 and 5, defendants placed $49,206 in CEC proceeds into the Sun State Account.  Within that same month, disbursements to themselves and for questionable expenditures from that account amounted to $31,923 ($14,500 + $17,423), accounting for a significant portion of the CEC deposits.  When disbursements to CEC and Time to Buy Inc. (which the court does not require to be disgorged but are nonetheless suspicious) are included, the disbursements total $45,923, a fairly close match to the deposits.  While it is certainly possible that these disbursements could be connected to *non-CEC* deposits (which accounted for

69% of the deposits that month, Ex. 251 at 5), defendants have provided no meaningful evidence to support such a view.  On balance, therefore, an inference that many of the disbursements generated personal profit to the Levines from their fraudulent activities — and that 31% of those disbursements should be disgorged — is warranted.

83.     Other evidence put forward by the Levines fails to persuade the court.  Apparently to suggest that he and his wife received no benefit from the sale of CEC stock by Wire to Wire, Gerald Levine claimed that Wire to Wire used the proceeds of its sales of the CEC stock to fund CEC.  G. Levine Test. at 48:13–49:12.  Defendants also put forward evidence that during fiscal year 1997 (ending March 31, 1997), Wire to Wire allegedly loaned CEC Industries the sum of $207,000, most of which purportedly came from the proceeds of Wire to Wire's sales of CEC stock.  *Id.* at 49:3–50:25; Exhibit BBBBB at 21.

84.     Even if this evidence is to be believed — and there is reason to doubt it — it does not alter the transaction history for November and December 1996, during which time only $25,000 (of $184,408 in the CEC proceeds placed in Wire to Wire's account) was advanced back to CEC.  And the court has already excluded those disbursements from its disgorgement order.

85.     It is also irrelevant that defendants purportedly paid back funds they received from Wire to Wire.  "The manner in which [defendants] chose to spend [their] misappropriations is irrelevant as to [their] objection to disgorge. Whether [they] chose to use this money to enhance [their] social standing through charitable contributions, to travel around the world, or to keep [their] co-conspirators happy is [their] own business."  *SEC v. Benson*, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987); *Kenton Capital*, 69 F Supp. 2d at 15–16.  The court will not offset funds unjustly obtained merely because those funds were allegedly given back.

86.     Finally, the court is not persuaded by the report of Russell Olsen, which levies
numerous criticisms against the conclusions reached by Salomon.  Ex. EEEEE.  These criticisms,
which include statements that Salomon's analysis was "incomplete" or that it unjustifiably
"specifically" attributed expenditures to CEC proceeds, *id.* at 4, 14, attempt to impose a standard
of exactitude not required for the court's purposes here.  The standard for disgorgement is a
reasonable approximation of profits, and Olsen's exacting critique does nothing to undercut the
Commission's (partial) satisfaction of that standard.

    **b.**  **June to October 1996 CEC deposits in Wire to Wire accounts**

87.     The Commission also requests disgorgement of $236,907, which represents sales
of CEC shares between June 1, 1996, and October 22, 1996, from Wire to Wire's brokerage
accounts.  J. Salomon Hr'g Test. at 31:14–32:2; Sched. 5.  While that amount went to the Sun
State Wire to Wire bank account that defendants controlled, no records were available for this
earlier period to trace how they disbursed these funds.  *See* J. Salomon Hr'g Test. at 31:24–32:2.

88.     The court, drawing an inference against defendants based on their history of
dealings with Wire to Wire and their non-cooperation with discovery, would award disgorgement
of all these proceeds if no other mitigating evidence existed on the record.

89.     Such evidence does exist, however.  As noted, defendants have put forward
evidence that Wire to Wire (perhaps illegally) loaned CEC, in aggregate, $207,000 during the
1997 fiscal year.  G. Levine Test. at 49:3–50:25; Exhibit BBBBB at 21.  Though the court has
doubts as to the credibility of this evidence, it must nonetheless accord it due weight and
therefore reduces the $236,907 disgorgement it would otherwise order by an approximation of
the stock proceeds that flowed via Wire to Wire back to CEC, rather than to the Levines.  In so

doing, the court takes notice that Wire to Wire made disbursements of $34,000 to CEC between November 1996 and January 1997. Olsen Reconciliation at 8–9. No explanation for these disbursements exists on the record other than that they were part of the alleged $207,000 loan, so the court will deem them as such. Also, even assuming that all of the $207,000 came from the Sun State account (rather than some other Wire to Wire source), there were substantial non-CEC-proceed deposits into that account between June and October 1996 (amounting to at least $80,551) that were as likely as the stock proceeds to be used to make the alleged loan amounts to CEC. *Id.* at 1–15. Therefore, the court will reduce the disgorgement order for June through October 1996 by $129,103.41, an amount representing an approximate portion of the $207,000 that can be traced to the CEC proceeds during that period.[5] The resulting amount to be disgorged is **$107,803.59**.

### c.    Certificate of deposit held in trust for the Levines

90.     In addition to the CEC proceeds that flowed to Wire to Wire, the Commission alleged that proceeds flowed to the Levines via their lawyer, Alvin Green. The court disagrees.

91.     As noted above, in November 1996, Green authorized Gerald Levine to withdraw money and securities from Green's account at Pacific International Securities. M. Levine Dep. I at 172:20–177:10; Ex. 248 at 10 (M. Levine Dep. II at 506:10–508:16).

92.     On November 6, 1996, Gerald Levine directed the transfer of $74,701 (of $130,468) in CEC stock proceeds from Green's Pacific International brokerage account to his law firm's client trust account. Ex. 248 at 7 (M. Levine Dep. I at 175:14–176:9). An additional

---

[5] The court reaches this number via the following formula: (loan amount − (Nov.-to-Jan. disbursements to CEC)) x (percentage of deposits traceable to CEC stock sales) = ($207,000 − $34,000) x ($236,907 x ($236,907 + $80,551)) = $173,000 x (.7463) = $129,103.41.

$77,705 from Wire to Wire's Pacific International brokerage account flowed to the client trust account.  Sched. 2.

93.     On December 5, 2007, a $250,000 certificate of deposit ("CD") held in trust for Gerald and Marie Levine was created at Sanwa Bank, which may have been funded in part by these CEC proceeds.  Sched. 2.

94.     Even if the court were to assume that the Levines funded this CD with the CEC sale proceeds, there is no evidence indicating that defendants received any proceeds from the CD. J. Salomon Hr'g Test. 57:16–58:9.  Indeed, the uncontradicted testimony of Gerald Levine is that neither he, nor Marie Levine, nor Wire to Wire, nor any family member, nor any entity in which he is an officer, director or shareholder, received any proceeds from the CD.  G. Levine Test. 38:24– 39:18.  Though these transactions generate an aura of suspicion, the Commission has failed to satisfy its burden to show that the Levines were unjustly enriched via the proceeds that allegedly went into the CD.

### d.     Cashier's checks from Levine Bank of America account

95.     Finally, another component of the monies the Commission alleges are traceable to CEC Proceeds and subject to disgorgement by the Levines derives from three cashier's checks cumulatively totaling $23,200, which were purchased on April 30, 1996, from money deposited into a Bank of America bank account in the names of Brad Levine and Gerald Levine. The funds used to purchase these cashier's checks were transferred to the bank account from the Pacific International brokerage account of Lisa Levine and represented the proceeds from her sale of CEC stock in April of 1996.  Ex. 251, Sched. 1, 2; J. Salomon Hr'g Test. at 41:3–17, 58:10–25.

96.     These proceeds cannot be linked to the illegal conduct of defendants in that these transactions occurred prior to defendants' filing of any of the reports with the Commission that the Commission maintained were false and fraudulent.  Thus, the sales that generated the proceeds predated any unlawful conduct of defendants.  Ex. AAAAA.  Ordering disgorgement of these proceeds is not warranted.

### E.     Conclusion Regarding Disgorgement

97.     The Commission has established that **$217,368.59** is a reasonable approximation of defendants' unlawful profits.  The Levines will be ordered to disgorge this amount.

### F.     Interest

98.     Disgorgement rightly includes prejudgment interest to enable the Commission to recover the full amount of the defendants' unjust enrichment and to provide the possibility of complete compensation to the defrauded investors.  *See*, *e.g.*, *Hasho*, 784 F. Supp. at 1112.  To preclude defendants from enjoying an interest-free loan on their illicitly-obtained gains, the court requires them to pay interest on the amounts they disgorge.  *Kenton Capital*, 69 F. Supp. 2d at 16–17.

99.     The Commission calculates prejudgment interest by using the rate that the Internal Revenue Service sets for money owed to the United States Treasury.  *E.g.*, *First Jersey Sec,* 101 F.3d at 1476–77; *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 612 n.8 (S.D.N.Y. 1993), *aff'd sub nom, SEC v. Posner*, 16 F.3d 520 (2d Cir. 1994).  "Courts have approved the use of the IRS underpayment rate in connection with disgorgement."  *First Jersey Sec.*, 101 F.3d at 1476.

100.    In addition to the award of disgorgement, the court will order defendants to pay

prejudgment interest calculated through the date of the court's final judgment and order.

## III.    THE LEVINES' CONDUCT WARRANTS THE IMPOSITION OF A SUBSTANTIAL CIVIL PENALTY

101.    Both the Securities Act and the Exchange Act direct the Commission to seek

statutory penalties against those who violate these securities laws.  Such penalties are limited to

$100,000 per violation where the defendant is a natural person, or the "gross amount of

pecuniary gain" attained by the defendant from each violation, whichever is greater.  15 U.S.C.

§ 78u(d)(3)(B).[6]

102.    Defendants filed approximately twenty-nine reports with the Commission.  Each

of those involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory

requirement.  Defendants' misrepresentations also directly or indirectly resulted in substantial

losses or created a significant risk of substantial losses to many investors.  Each dollar earned by

defendants through their fraudulent sales of CEC stock was a dollar out of the pocket of an

innocent investor.  Defendants' conduct meets all of the criteria for finding "Third Tier"

violations, which are available when the securities law violation "involved fraud, deceit,

manipulation, or deliberate or reckless disregard of a regulatory requirement [and] such violation

directly or indirectly resulted in substantial losses or created a significant risk of substantial loss

to other persons."  *Id.* §§ 77t (d)(2)(C), 78u (d)(3)(B)(iii).

---

[6] The Securities Act contains a parallel provision with nearly identical language. *See* 15 U.S.C. § 77t(d)(2)(C).  Pursuant to the Debt Collection Improvement Act of 1996, the Commission has promulgated rules that increase the penalty of $100,000 per violation to $110,000 with respect to conduct occurring after December 9, 1996, but before February 2, 2001. *See* 17 C.F.R. § 201.1001.

103.    The Commission proposes a penalty that attempts to approximate defendants'
gross pecuniary gain from their numerous violations.  The recommended penalty of $540,000
essentially mirrors the $536,289 that the Commission has asked the court to order that defendants
disgorge.  In light of the cumulative gross pecuniary gain which has been proven to the court and
the equities of this case, the court will assess a lesser penalty of **$200,000**.  This penalty is
consistent with penalties that this court has imposed for similar conduct in previous actions.  *See*
*Kenton Capital*, 69 F. Supp. 2d at 17, 20 (imposing a $1.2 million penalty on a defendant for his
role in a prime bank scheme, where it also ordered the payment of $1.745 million in
disgorgement, plus prejudgment interest).

## IV.    AN INJUNCTION AND AN OFFICER/DIRECTOR BAR ARE WARRANTED

104.    The Commission also requests that the court (1) enjoin defendants from
committing further violations of securities laws and (2) impose upon the Levines a lifetime bar
from serving as officers or directors of public corporations.  In assessing these requests, the court
makes the following findings regarding the Levines' history and recent business dealings:

### A.    History

105.    One of the Commission's witnesses at trial testified about claims that Gerald and
Marie Levine made about their employment experience, which illustrated their longstanding
involvement in running various businesses.  Trial Tr. II at 54:13–56:4.

106.    Gerald and Marie Levine have devoted much of their working lives to operating

businesses, and in particular, structuring corporate transactions involving public companies.

These experiences are described in a CEC filing with the Commission.[7]

107.    Though much of this history is undisputed, Gerald Levine's testimony at the

December 4, 2006 remedies hearing demonstrated that the statements in this filing were also

false in one respect: he admitted that he never graduated from John Carroll University as he

previously claimed.  G. Levine Test. at 64:22–65:4.

**B.    Recent History**

108.    The Levines' extensive involvement in operating companies, including public

companies, is further demonstrated by the history of their dealings since the perpetration of their

fraud.

---

[7] According to the filing:

Gerald H. Levine is Chairman of the Board, Chief Executive Officer and President of C.E.C. Industries Corp. Mr. Levine graduated from John Carroll University, Cleveland, Ohio, with a degree in Business Administration.  Mr. Levine was Executive Vice President of Lincoln Automotive and Lincoln Bearing from 1955 to 1970.  From 1970 to 1979, he was President and Chief Operations Officer of Cle-Ware Industries, which purchased Rayco Industries building sales to over 90 Million and employing 3,000 workers.  From 1979 to 1988, Mr. Levine operated Centrum Consulting Corp.  Working with companies seeking merger partners.  In 1988, Mr. Levine became President of On Target Sports Selections, a computerized Line Service.  In November of 1990, On Target Sports completed a reverse merger with American Jet Holdings Inc. later changing the name of the corporation to O.T.S. Holdings, Inc.

Marie A. Levine is Chief Financial Officer and Secretary/Treasure of C.E.C. Industries Corp. Mrs. Levine worked for the University of Nevada at Las Vegas Computing Center form 1972 to 1977.  From 1977 to 1988, Mrs. Levine operated privately held companies including property management and bookkeeping services.  In 1988, she became involved with the automation of the On Target Sports Selections computerized system, and became Secretary/Treasure of O.T.S. Holdings, Inc.

Ex. 1 at 21.

109.     In the late 1990s, Gerald Levine founded another public company called Starbase1
Coffee, Ltd. (Starbase).  G. Levine Test. at 79:5–7; G. Levine Dep. at 105:4–106:7.  Gerald
Levine was the first president of Starbase, and Marie Levine was its first secretary-treasurer.
Gerald Levine Nu Star Investigation Test., February 1, 2005 ("G. Levine Nu Star Test.") at
40:5–40:10.  Starbase's operations as a coffee vendor ceased shortly thereafter, but the Levines
maintained it as a public company for later use as a corporate vehicle where they could place
future businesses.  *Id.* at 47:21–48:17.

110.     In 1999, Wire to Wire had entered into a consulting agreement with Starbase.
Under that agreement, Wire to Wire provided Starbase with the management services of Gerald
and Marie Levine.  G. Levine Test. at 79:12–80:3; G. Levine Dep. at 107:20–109:13.

111.     In early 2004, Starbase changed its name to Nu Star Holdings Corporation.
G. Levine Test. at 80:6–8.  The Levines were responsible for the name change, and they
continued to provide management services to Nu Star under the previous agreement between
Starbase and Wire to Wire.  *Id.* at 80:9–11; G. Levine Dep. at 107:14–110:18.

112.     In 2004, at the instance of Gerald Levine, Nu Star undertook a "Regulation S"
stock offering.  (Regulation S of the Exchange Act exempts certain sales of securities of U.S.
issuers to non-U.S. persons.)  G. Levine Test. at 80:12–81:10; G. Levine Dep. at 111:23–113:12.
Gerald Levine engaged an attorney to work on offering documents.  G. Levine Dep. at
114:20–116:15.  The offering raised approximately $500,000.  G. Levine Test. at 81:11–81:18;
G. Levine Dep. at 117:14–119:9.

113.     Gerald Levine traveled to Barcelona, Spain in 2004 to find people to sell Nu Star
shares to investors in Europe.  G. Levine Test. at 80:12–18; G. Levine Dep. at 119:24–120:21.

33

He also tried to establish a sales operation in California to sell Nu Star stock.  G. Levine Dep. at 122:3–122:17.  The Nu Star offering continued at least through early 2005.  G. Levine Nu Star Test. at 202:7–9.

114.    While Mr. Levine claimed that he did not know how much Nu Star "raised" through the Barcelona sales office, he admitted that it was a "sizeable amount."  G. Levine Test. at 81:11–81:15.  Other exhibits indicate that through this operation approximately 200 investors paid nearly $2 million to purchase shares of Nu Star.  *See* Exs. 273, 274, 275, 277, 278. Mr. Levine, admitted, however, that of the nearly $2 million that the Barcelona operation raised, approximately $500,000 went to NuStar while the balance, some $1.5 million, went to the brokers who sold that stock to investors.  G. Levine Test. at 81:6–22.

115.    From mid to late 2004, Wire to Wire acted through the Levines to sell Nu Star stock to several individuals who lived in Western New York.  G. Levine Test. at 81:23–82:10; G. Levine Dep. at 123:5–125:23.  Gerald Levine testified that he personally spoke to at least two investors.  G. Levine Test. at 82:4–82:17.  In his deposition, he acknowledged that the spoke to approximately six or seven individuals in connection with these sales of Nu Star stock. G. Levine Dep. at 126:3–126:21.

116.    Gerald Levine admitted that Wire to Wire sold Western New York investors Nu Star stock totaling approximately $60,000 to $70,000.  G. Levine Test. at 56:6–21.  Other evidence shows that these investors invested approximately $140,000 in purchasing Nu Star shares from Wire to Wire.  Exs. 277, 278; Joint Pre-Hr'g Statement ("Joint Statement") at 2–5 (Kantor Stipulations 1–10; Kellner Stipulations 1–4).

117.    Gerald Levine has been involved in efforts to sell the stock of other companies overseas during and after 2004.  G. Levine Dep. at 133:23–134:10; 141:15–142:23.

118.    Mr. Levine arranged for MoneyTV, an internet television broadcaster, to prepare and distribute a program that promoted Nu Star.  That program ran from August to November 2004.  G. Levine Dep. at 159:15–162:18; G. Levine Nu Star Test. at 202:19–204:9.

119.    Marie Levine prepared a tri-fold brochure containing information about Nu Star. Marie Levine Nu Star Testimony, February 2, 2005 ("M. Levine Nu Star Test.") at 163:13–167:18.  Viewers of the program who expressed an interest in Nu Star received printed copies of that brochure.  G. Levine Dep. at 179:15–182:10; Ex. 267.

120.    At least one of the Western New York investors purchased Nu Star shares from Wire to Wire after he viewed the MoneyTV program to which Gerald Levine referred him.  Joint Statement at 2–4 (Kantor Stipulations 1–10).

121.    As of December 4, 2006, neither the Commission nor any state securities agency nor any private citizen has brought any proceeding against Starbase, Nu Star, Gerald Levine, or Marie Levine, alleging that any of them have violated any state or federal securities laws in connection with the business and activities of Starbase/Nu Star. G. Levine Test. at 50:11–51:5.

122.    Gerald Levine stated in his deposition that he plans to continue his consulting activities and continue assisting companies in distress, including possibly public companies. G. Levine Dep. at 245:2–246:19.  However, he qualified that intention in this hearing.  G. Levine Test. at 83:19–84:2.  Marie Levine, who suffers from kidney disease, has stated that she has no present intention of again becoming an officer or director of any public company.  M. Levine Dep. 218:4–10.

**C.     Whether the Bar Is Warranted**

123.    The Sarbanes-Oxley Act of 2002 amended prior law to permit courts to impose a
bar on violators of federal securities laws, based on "unfitness" to serve as an officer or director
of a publicly traded company.  15 U.S.C. § 78u(d)(2) (providing that a court may impose a bar "if
the person's conduct demonstrates unfitness to serve as an officer or director" of a public
company); Sarbanes-Oxley Act of 2002, Pub.L. No. 107-204, § 305(a), 116 Stat. 745 (codified at
scattered sections of 11, 15, 18, 28, and 29 U.S.C.).  Under prior law, the statute allowed for such
a bar where the person's conduct demonstrated "substantial unfitness" to serve as an officer or
director.  15 U.S.C. § 78u(d)(2) (2001).

124.    Unfortunately, Congress has provided no guidance on the meaning of the term
"unfitness," and has even failed to instruct courts regarding whether its deletion of the word
"substantial" was meant to increase or reduce the government's quantum of proof.  *See* Jayne
W. Barnard, *SEC Debarment of Officers and Directors After Sarbanes-Oxley*, 59 Bus. Law. 391,
408 (2004).  It is clear from the history of the legislation, however, that Congress's intent was to
reduce the government's burden.  *Ibid.*; *see also Martinez v. Cape Fox Corp.*, 113 P.3d 1226,
1233 n.27 (Alaska 2005) (observing, in a case interpreting state securities law, that "in 2002
Congress changed the test . . . because it believed that courts were applying too stringent a
standard"); Jayne W. Barnard, *Rule 10b-5 and the "Unfitness" Question*, 47 Ariz. L. Rev. 9, 20
(2005) (same); S. Rep. No. 107-205, at 27 (2002) ("The Commission has argued that the
'substantial unfitness' standard for imposing bars is inordinately high, causing courts to refrain
from imposing bars even in cases of egregious misconduct.  The proposed bill rectifies this

36

deficiency by modifying the standard governing imposition of officer and director bars from 'substantial unfitness' to 'unfitness.'").

125.     What is the proper rubric?  Surprisingly, this appears to be a question of first impression in the federal courts.  While other courts have assessed post-Sarbanes-Oxley requests for officer/director injunctions, they have tended to simply continue using the pre-Sarbanes-Oxley standard, and none appears to have addressed the Act's alteration of the Commission's burden of persuasion. *See*, *e.g.*, *SEC v. Patterson*, 2006 WL 770626, at *3 (N.D. Okla. Mar. 23, 2006); *SEC v. Save The World Air Inc.*, 2005 WL 3077514, at *16 (S.D.N.Y. Nov. 15, 2005); *SEC v. Global Telecom Servs, L.L.C.*, 325 F. Supp. 2d 94, 121 (D. Conn. 2004); *SEC v. Intelliquis Intern., Inc.*, 2003 WL 23356426, at *19 (D. Utah Dec. 11, 2003); *SEC v. Henke*, 275 F. Supp. 2d 1075, 1086 (N.D. Cal. 2003); *see also Martinez*, 113 P.3d at 1233 & n.27 (applying the pre-Sarbanes-Oxley test with minor modifications).

126.     Under the prior statute, courts generally adopted an approach drawn primarily from the Second Circuit's decision in *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir.1995).  Under this approach, courts considered a number of factors, including "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur."  *Ibid.*[8]  Moreover, while it was "not essential" that a defendant have committed past violations before a lifetime ban was imposed, it was "essential, in the absence of

---

[8] These factors were assessed by the district court in *Patel* after having been suggested originally in a law review article by Professor Jayne W. Barnard.  *See Patel*, 61 F.3d at 141; Jayne W. Barnard, *When is a Corporate Executive "Substantially Unfit to Serve"?*, 70 N.C. L. Rev. 1489, 1492–93 (1992).

such violations, that a district court articulate the factual basis for a finding of the likelihood of recurrence." *Id.* at 142.  Courts also "consider[ed] whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might [have been] sufficient, especially where there [was] no prior history of unfitness." *Ibid.*

127.    One commentator has suggested that courts consider the following non-exhaustive list of factors in making a post-Sarbanes-Oxley "unfitness" determination:

> (1) the nature and complexity of the scheme; (2) the defendant's role in the scheme; (3) the use of corporate resources in executing the scheme; (4) the defendant's financial gain (or loss avoidance) from the scheme; (5) the loss to investors and others as a result of the scheme; (6) whether the scheme represents an isolated occurrence or a pattern of misconduct; (7) the defendant's use of stealth and concealment; (8) the defendant's history of business and related misconduct; and (9) the defendant's acknowledgment of wrongdoing and the credibility of his contrition.

Barnard, *Rule 10b-5 and the "Unfitness" Question*, 47 Ariz. L. Rev. at 46.  In addition, this commentator suggests that in a case involving a first-time offender, the defendant may be unfit to serve where his "fraud has been 'outside the heartland' of conventional frauds, either because of its magnitude or its impact on investors, in which he has been the driving and organizing force (or 'kingpin') and for which he expresses no credible contrition or remorse." *Id.* at 54–55.  The court agrees that these factors are relevant and will consider each of them in its holistic determination of the Levines' fitness to serve.

128.    The Levines undertook a complex scheme of stealth and concealment by which they defrauded investors and brought financial gain to themselves using entities they substantially or completely controlled.  Application of the first five factors and the seventh factor mentioned above, therefore, favors a finding of unfitness.

129.    Moreover, the scheme was sufficiently complex (and involved sufficient numbers of representations and actions) that it, in and of itself, represented a pattern of misconduct, however lacking the record may be regarding other misconduct by the Levines.  The sixth factor, therefore, slightly favors a finding of unfitness.

130.    There is no evidence of a history of business and related misconduct by the Levines apart from the fraudulent conduct here.  The eighth factor disfavors a finding of unfitness.

131.    The Levines have utterly failed to acknowledge their wrongdoing or show contrition.  The ninth factor, therefore, favors a finding of unfitness.

132.    Finally, the Levines' fraud lies "outside the heartland" of conventional frauds, given their undisputed "kingpin" status and the magnitude of the fraud's impact.

133.    In addition to the aforementioned nine factors, the factors previously assessed by courts also favor a finding of unfitness.  Defendants' conduct clearly meets four out of the six *Patel* criteria for injunctive relief: (1) their underlying violations are egregious; (2) defendants committed their violations while they were serving as president and secretary-treasurer of a publicly traded corporation; (3) defendants acted with a very high degree of scienter; and (4) defendants gained substantial unjust enrichment through their violations.  Moreover, defendants' involvement with public companies after the jury's verdict, while it may not show an extremely strong likelihood of future misconduct, raises a spectre of such misconduct (or at least demonstrates the Levines' desire to put themselves in positions where opportunities to engage in misconduct are available) that should not be completely disregarded.  *See* Barnard, *Rule 10b-5*

*and the "Unfitness" Question*, 47 Ariz. L. Rev. at 53 (noting the extreme difficulty of predicting future misconduct from past behavior, particularly in cases involving first offenders).

134.    Upon consideration of the aforementioned factors and the record of this case, the court determines that the evidence supports a finding that the Levines are unfit to serve as officers and/or directors of public companies, notwithstanding their status as first-time offenders.

135.    This determination, however, does not end the court's inquiry.  That the Levines are unfit does not necessarily require that a lifetime ban is the appropriate remedy for their actions.  Drawing from pre-Sarbanes-Oxley precedent, the court considers it proper to ask "whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might be sufficient, especially" in light of the Levines' lack of a "prior history of unfitness."  *Patel*, 61 F.3d at 142.

136.    A shorter ban is an appropriate remedy.  The court will issue an officer/director bar against the Levines of ten years, to commence from the date of entry of this order.

**D.    Whether an Injunction Is Warranted**

137.    Finally, the Commission requests an injunction against further violations of securities laws.  A district court has broad discretion to enjoin possible future violations of the federal securities laws in view of a showing of past violations, when there is a reasonable likelihood that, unless enjoined, the violations will continue.  *First Jersey Sec.*, 101 F.3d at 1477; *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972).  In determining whether a proper showing has been made, the court must find a reasonable likelihood that past wrongdoing will recur.  *See SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 18 (2d Cir. 1977); *SEC v. Johnson*, 2006 WL

2053379, at *4 (S.D.N.Y. July 24, 2006).  To make this showing the Commission is required to go beyond the mere facts of past violations.  *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978).  However, "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations."  *Manor Nursing Ctrs.*, 458 F.2d at 1100.

138.    The court will also consider the degree of the scienter involved; the sincerity of the defendant's assurances against future violations; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; and the likelihood, because of the defendant's occupation, that future violations might occur.  *See Universal Major Indus.*, 546 F.2d at 1048.  There is no requirement that the Commission demonstrate irreparable injury or lack of any adequate remedy at law.  *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  The court, however, will engage in the traditional balancing of the equities before issuing an injunction.  *See SEC v. Geon Indus., Inc.*, 531 F.2d 39, 54–55 (2d Cir. 1976); *Manor Nursing Ctrs.*, 458 F.2d at 1102 ("[A] district court is called upon to assess all those considerations of fairness that have been the traditional concerns of equity courts."); *Johnson*, 2006 WL 2053379, at *4.

139.    An injunction against violating securities laws is warranted.  Defendants continue to place themselves in positions where opportunities to commit securities violations may arise, and their actions at issue here showed a high degree of scienter.  Defendants have made no acknowledgment of wrongdoing, nor have they made reliable assurances against future violations.  Most importantly, the court concludes, based upon the nature of defendants' prior conduct and their lack of contrition, that future violations are reasonably likely to occur.

140.    The court, therefore, will enjoin defendants from committing further violations of securities laws for a limited period of ten years.

## CONCLUSION

For the foregoing reasons, the court will, in an order of judgment accompanying this motion, order disgorgement of $217,368.59 by Gerald and Marie Levine, who are jointly and severally liable for such disgorgement, plus prejudgment interest.  The court will also order payment of a civil penalty of $200,000, for which defendants are also jointly and severally liable, and will enjoin Gerald and Marie Levine for a period of ten years from servings as officers and/or directors of public companies, and for a period of ten years from violating federal securities laws. An appropriate order accompanies this memorandum.


Henry H. Kennedy, Jr.
United States District Judge


Dated: May 8, 2007