## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**GERALD H. LEVINE, and**<br>**MARIE A. LEVINE,**<br><br>        **Defendants.** | **Civil Action 99-02568 (HHK)** |

### MEMORANDUM

The U.S. Securities & Exchange Commission (the "Commission" or "SEC"), brought this action on September 28, 1999, claiming that the defendants Gerald H. Levine and Marie A. Levine (together the "Levines" or "Defendants") violated several provisions of federal securities laws. The Commission sought injunctive relief, including disgorgement of illicit profits, prejudgment interest, and statutory penalties.

At the conclusion of a ten-day trial, a jury returned a verdict finding that the Levines had violated three laws: Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 under that law [17 C.F.R. § 240.10b-5], Sections 17(a)(1), (2) and (3) [15 U.S.C. § 77q(a)(1), (2) and (3)] of the Securities Act of 1933 ("Securities Act") and Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] of the Exchange Act and Rule 13b-2-1 under that law [17 C.F.R. § 240.13b-2-1].

Thereafter, on December 4, 2006, the Court conducted a hearing to determine the remedies to which the Commission was entitled given the jury's verdicts. Eventually this Court entered an "Order of Judgment" that required the Levines to:

a.   Pay disgorgement in the amount of $217,358.69 within thirty (30) days.

b.   Pay prejudgment interest in the amount of $230,325.59 within thirty (30) days.

c.   Pay a $200,000 civil penalty within thirty (30) days.

d.   Refrain from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

On December 20, 2007, the Commission filed an *Ex Parte* Motion For Emergency Relief And Application For An Order To Show Cause Why Defendants Should Not Be Held In Civil Contempt ("*Ex Parte* Motion").  In its motion, the Commission contended that the Levines were in contempt of Court for two main reasons:

a.   The Levines had allegedly failed to pay any part of the $447,684.28 of disgorgement and prejudgment interest ordered in the June 6, 2007 Order of Judgment; and

b.   The Levines had allegedly violated the Court's June 6, 2007 injunction against further violations of the antifraud provisions of the federal securities laws.

Pursuant to the Commission's Motion the Court conducted civil contempt proceedings on February 20, 2008, and March 11, 12 and 13, 2008, at the conclusion of which the Court found the Levines in contempt of Court for their failure to pay the judgment.  The parties were required to submit proposed findings of fact and conclusions of law regarding the Levines' alleged violation of the June 6, 2007 injunction against further violations of the antifraud provisions of the federal securities laws.

Having considered the evidence presented at the hearing and the Parties Proposed Findings of Fact and Conclusions of Law, the court makes the following:

**FINDINGS OF FACT**

**I.    THE LEVINES ARE NOT CREDIBLE WITNESSES**

1.  During the lengthy time this case has been pending, the Court has had the opportunity to assess the Levines' credibility and candor with the Court.  Their credibility and candor were often lacking with respect to important matters.

2.  For example, Mrs. Levine was impeached numerous times when she testified during the hearing.  In one instance, Mrs. Levine claimed that she never signed for her daughter, MaryAnn Metz ("Metz"), on corporate checks.  This testimony was directly contradicted by an affidavit Mrs. Levine attempted to admit into the proceeding which stated:  "On occasion, I have signed MaryAnn Metz's name on documents and check drafts for the companies."  (3/11/08 Tr. at 131).  Mrs. Levine's explanation for this contradictory testimony was "I don't really think that clear in the afternoon."  (3/12/08 Tr. at 38).  This explanation is simply not credible.

3.  Other parts of Mrs. Levine's testimony were similarly unbelievable.  Mrs. Levine admitted that she lost over $209,000 gambling in Station Casinos properties in the year 2007.  But Mrs. Levine claimed that she still thinks she won gambling money that year because she did better at video poker machines that are located in a grocery store she frequents. Mrs. Levine's testimony on this point is not believable.

4.  Mrs. Levine's own interrogatory answers indicate that she did not have anywhere close to $200,000 in gambling winnings from grocery stores in 2007. (Pl. Ex. 117).[1] Any time individuals win more than $1,200 gambling, they are given a W-2G.

---

[1]   "Pl. Ex." refers to a Plaintiff's Exhibit admitted in this matter.  "Def. Ex." refers to a Defendant's Exhibit.

And the W-2Gs the Levines have from the grocery stores add up to well under $100,000. In addition, there can be no question that Mrs. Levine must have lost some amount of money gambling in grocery stores, and those losses would offset the winnings reflected in the proffered W-2G's.  Furthermore, rather than claiming that she gambled more at the grocery stores, Mrs. Levine testified that her favorite place to gamble is Station Casinos. In sum, Mrs. Levine's testimony regarding her alleged gambling winnings in 2007 is in direct conflict with her interrogatory answers and the documentary evidence.  Her testimony also defies common sense.

5.  Mrs. Levine also contradicted herself when trying to explain how she used the checks made out to her, to her husband, or to cash from Delaware Escrow or Euro Escrow accounts.  For example, she first stated that she would go to the bank and get money to assist the companies, and then, *two sentences later*, she stated that, because of her health problems, she could not "just pick up on a moment's notice and move or do anything." (3/11/08 Tr. at 34).  And her explanation that her health problems prevented her from travel was contradicted by her later testimony concerning the trips she took in 2007.  She testified that she went on a cruise to Mexico; she traveled to California more than once; she went to Texas; and she went to Florida.  Thus, her testimony regarding her ability to travel was not credible.

6.  Another example of Mrs. Levine's inconsistent testimony concerns the ownership of the 2006 Cadillac Escalade that she and her husband drive.  Initially, when discussing who owns the car, Mrs. Levine described herself and her husband as the "title owners," while her mother was the "legal owner." (3/11/08 Tr. at 41).  After further questioning from the Court, she changed her story, claiming that her mother's purchase

4

of the car was "like a loan to us, the money was a loan to us because she kept the title, she was – she was the lien holder on the title." (3/11/08 Tr. at 43).  As for why the car ownership was set up as it was, Mrs. Levine claimed that the car was so titled "for insurance purposes." (3/11/08 Tr. at 42).  Casting further doubt upon the insurance excuse was Mrs. Levine's acknowledgment that they do not allow Mrs. Levine's mother to drive the car.

7.  Mr. Levine's testimony also repeatedly demonstrated that he was not credible. Mr. Levine admitted to being one of only two corporate officers for Public Highway. The other officer is his wife.  Although he is a corporate officer of a company with no employees other than himself and his wife, Mr. Levine claimed to know almost nothing about what Public Highway did in 2007.  The record clearly shows that Public Highway had no employees other than the Levines and kept all its corporate files in the Levines' home.  In fact, Mr. Levine initially claimed not to even be sure of his own position at Public Highway.  Mr. Levine also claimed to be ignorant regarding the reason a substantial amount of checks were written to himself and his wife from the account of Public Highway.  Given that Mr. Levine was one of only two officers and directors of Public Highway, it is beyond belief that he would not know the reason his own company wrote thousands of dollars of checks to himself and his wife.

8.  Mr. Levine's testimony regarding the business activities of Public Highway and Wire to Wire was also totally unbelievable.  He stated that Public Highway was a consulting firm, and that he and his wife were the only consultants.  But then, in response to a question as to whether Public Highway served as an escrow agent in 2007, he replied, "I can't answer you what it did because I wasn't involved in it." (2/20/08 Tr. at

81).  Mr. Levine's stated knowledge of Wire to Wire was even less clear.  When asked whether Wire to Wire, a company that he and his wife run exclusively, conducted any business in 2007, Mr. Levine testified, "I'm sure it did, but I can't answer you directly what it was."  (2/20/08 Tr. at 81).  It defies credulity that one of two officers and directors does not even know what business a company engages in.

9.  Mr. Levine's testimony was similarly not believable when it came to explaining why Euro Escrow wrote him checks.  Mr. Levine testified that, while he did not work for Euro Escrow, he "did do some errands for them," but he was not paid for this work.  (2/20/08 Tr. at 71).  Thus, he would have this Court believe that Euro Escrow's checks written to him were "to pay some expenses for Euro Escrow."  Each of the five checks in question was for $2,000; Mr. Levine received $10,000 from Euro Escrow from February 26, 2007 to August 23, 2007, and yet his testimony is that he cannot recall what those payments were for, other than "to pay some expenses."  This testimony is not believable.

10.  Mr. Levine's testimony regarding the source of the funds he used to gamble was also not credible.  He acknowledged that he gambled with money obtained from several sources: his social security income, advances from credit cards, money borrowed from MaryAnn Metz or her husband, or free play offered by the casino.  But when asked who paid off the credit cards, Mr. Levine stated "I can't answer how they were paid because they could have been paid by some gaming winnings.  I don't know, that's not what I do, so I can't answer that question."  (2/20/08 Tr. at 88-89).  Given that Mrs. Levine's testimony acknowledged that she lost over $200,000 in 2007 at Station Casino, and given the evidence the Levines themselves offered that their winnings at other

gambling establishments did not make up for the Station Casino losses, it is utterly unbelievable that Mr. Levine's credit cards were paid off using winnings from gambling.

11.   Mr. Levine's testimony regarding his mortgage payments was also unbelievable.  He acknowledged that Countrywide held the mortgage in his home.  He admitted that he does not pay that mortgage, but then claimed to be ignorant of who does pay for the house in which he and his wife live.

12.   Mr. and Mrs. Levine contradicted each other when they testified about a $17,000 ring that they purchased in January 2007 while on a cruise in Mexico, using money from a Euro Escrow account, and sold shortly thereafter.  Mr. Levine testified that he told his friend about the ring. Initially, Mr. Levine claimed that he didn't know how the ring was sold. Upon further questioning, he admitted that he told his friend about the ring, but he could not recall whether his friend came and talked to him, or to Mrs. Levine, or to Metz when he purchased the ring.  Mrs. Levine, on the other hand, answered very clearly that her husband sold the ring. What makes the conflicting testimony so unbelievable is that the ring cost more than the Levines claimed was their entire taxable income for 2006.  The idea that they could be unclear about such a significant purchase only one year after making it is patently absurd.

13.   Mr. and Mrs. Levine also contradicted each other regarding whether Delaware Escrow has an office in the Levines' own home.  Mr. Levine testified that Delaware Escrow only stored documents at the Levine home, but that its office was on South 10th Street.  Mrs. Levine, however, testified that, in fact, Delaware Escrow did maintain an office in the Levine home, and only used the South 10th Street office as a mail drop.  Metz confirmed Mrs. Levine's testimony that Delaware Escrow maintained

an office at the Levine home. Given that the Receiver testified that he found Delaware

Escrow documents in the Levine home, the Court finds Mr. Levine's testimony that it did

not maintain an office there to be unbelievable.

14.   The Levines also called their daughter, Metz,[2] to testify. Metz intervened in

this case. (DE 241). Metz is the trustee of The 1975 Trust which is ostensibly the owner

of two entities involved in the contempt proceeding – Delaware Escrow and Euro

Escrow. Metz's testimony on many points was not credible.

15.   Metz was impeached numerous times and she gave testimony that was

internally inconsistent. At one point, she explained that she gave her parents funds

because "My mom can't work." (3/12/08 Tr. at 142). She gave this answer in spite of

the fact that, *in response to the previous question*, she stated that she used Delaware

Escrow funds to pay her parents' expenses when her mother requested, partly because,

"She was also doing work for Delaware Escrow." (3/13/08 Tr. at 141-142).

16.   Metz tried to persuade this Court that she could not remember who acted as

the salesperson when Euro Escrow sold shares it allegedly owned in a company called

Immune-Tree International to investors in Europe. On her first day of testimony, she

claimed it was a person known as Cobi. The next day, when she resumed her testimony,

she corrected herself, stating that the person who acted as the salesperson for Euro

Escrow's Immune-Tree shares was Craig Cumming. She gave no reason other than to

imply that because their names were similar, she kept "getting them mixed up." (3/13/08

Tr. at 6). Such an explanation is not credible.

---

[2]   Metz is the natural daughter of Marie Levine. She is actually the step-daughter of
Gerald Levine. Metz testified that she has a great relationship with Gerald Levine.
(3/12/08 Tr. at 129).

17.  Finally, Metz stated that the escrow agreements that Delaware Escrow had were with Cobi.  But she would have the Court accept that she does not even know Cobi's last name.  It is simply not believable that a person supposedly running a very small business would have not one, but many, contracts with an individual, and would send that individual hundreds of thousands of dollars pursuant to those contracts, and yet would not know that individual's last name.

## II.        THE LEVINES ACT THROUGH CORPORATE ENTITIES

18.  The Levines have chosen to live their lives through corporate entities that they have created.  They do not personally receive investor funds or send out shares; they do so through corporations.  As is discussed fully below, the Levines, via their corporate entities, complete the sale of shares in small companies.  The Court heard evidence about the Levines' assisting in the completion of sales in shares of seven corporations in 2007:  Avitech LifeSciences, Inc.; Biomaxx Systems, Inc.; Evolution Global Capital Partners, Inc.; Green Machine Development Corp.; Xiiva Holdings, Inc.; Savior Energy Corp.; and Magellan Energy, Ltd.  In general, Mrs. Levine is told by agents for the seller of the shares ("Seller's Agents") that individuals have agreed to purchase shares in one of the corporations.[3]  Mrs. Levine then sends out a form, called a "Securities Purchase Application," that is completed by the individual investor.  After the investor completes the Securities Purchase Application, and wires funds to one of the Levines' corporations to purchase shares, Mrs. Levine then sends the investors their

---

[3]    "Seller's Agents" refers to individuals or entities that sold the securities to investors, primarily in Europe.  "Sellers" refers to the entities that purportedly owned the shares being sold by the Seller's Agents.

share certificates.  The Securities Purchase Application fails to disclose a number of critical facts, including: (1) the fact that the Levines have been found liable for securities fraud; (2) the amount of commissions to be paid to the sales agent; (3) the fact that the funds the investors send in will be commingled with general operating funds, and, in some cases, may be withdrawn by Mrs. Levine at a casino; and (4) the fact that the corporations acting as escrow agents for the securities purchases are not licensed to perform escrow work.  The Levines apparently believed that by handling all their business through their corporations, they could shield themselves from any responsibility for their actions.  They are wrong.

**WIRE TO WIRE**

19.  This Court has already found that the Levines used Wire to Wire as their alter ego.  (DE 221 at ¶¶ 33-34).  After the Court made that finding, the Levines continued to use Wire to Wire as their personal piggy bank, wholly ignoring corporate formalities. According to the Levines' own accounting, Wire to Wire wrote Marie Levine checks totaling $66,000 in 2007.  That same accounting shows Wire to Wire paying for many of the Levines' personal expenses, including medical expenses (Desert Radiologists and Medicare), credit cards (Direct Merchants Bank and Capital One), the power bill for their house, and the mortgage for their house. Furthermore, the Court heard testimony of other payments from Wire to Wire.  There were $24,000 in checks made out to cash (Pl. Ex. 88) and $7,000 in checks made out to Gerald Levine (Pl. Ex. 89).

20.  Wire to Wire's sole officers and directors are the Levines.  Wire to Wire also maintained its only offices in the Levines' house. Until the receivership was imposed in early 2008, Wire to Wire's paper records were stored at the Levine house.  And Wire to

Wire's electronic records were maintained on a computer in the Levines' bedroom, a computer that also contained the records of the other corporate entities at issue in this matter.

## PUBLIC HIGHWAY

21.   Public Highway is the Levines' alter ego.  Gerald and Marie Levine are the only officers and directors of Public Highway.  Public Highway's only offices are at the Levine house.  Until the receivership, Public Highway's paper records were stored at the Levine house.  And Public Highway's electronic records were maintained on a computer that was also used to maintain the records of the other corporate entities at issue in this case.

22.   The Levines also made liberal use of Public Highway's funds.  The Levines acknowledged receiving money from Public Highway, although they failed to calculate the exact amount.  In 2007, Public Highway wrote six checks to Marie Levine totaling $14,000.  Mrs. Levine also signed 14 Public Highway checks made out to "Cash" for a total of $32,000.  These checks were endorsed by Mrs. Levine.  The Levines also used Public Highway funds to pay for their personal expenses.  For example, Public Highway paid for Mr. Levine's health insurance at AARP.  Public Highway also paid for purchases Mrs. Levine made on ShopNBC. And Public Highway paid for purchases put on Mr. Levine's Sears card.

23.   The Levines also transferred large amounts of Public Highway funds to other entities.  On June 26, 2007, twenty days after this Court entered its Final Judgment in this matter, they sent $50,000 to Delaware Escrow.  And between April 28 and July 13, 2007, Mrs. Levine wrote five checks from Public Highway's account to Euro Escrow for a total

of $290,000.  Public Highway also transferred over $60,000 to a company called Aura

Trading in Cyprus on June 5, 2007.  Aura Trading was involved in the sale of securities

to investors in Europe.

24.  The Levines used Public Highway as an unlicensed escrow company.  Mrs.

Levine testified that Public Highway served as an escrow agent in 2007.  It was not

licensed to do so.  In fact, Public Highway was not licensed to do any business

whatsoever in 2007.  And the lack of an escrow license was not the only corporate

deficiency – Public Highway commingled the funds it received while acting as an escrow

agent in 2007..

## DELAWARE ESCROW

25.  Delaware Escrow was a company purportedly under the control of Metz, who

was its sole officer and director.  Notwithstanding this official arrangement, the

incontrovertible evidence demonstrates that the Levines used Delaware Escrow as their

alter ego.  Delaware Escrow's sole office was in the Levines' home.[4]  Delaware Escrow's

papers were kept exclusively at the Levines' home.  Delaware Escrow's electronic

records were maintained, along with those of the other Receivership Entities[5], on a

---

[4]  The Court rejects Mr. Levine's testimony that Delaware Escrow did not maintain an
office at the Levine home as contradicted by other testimony, as well as by the fact that
all the Delaware Escrow documents obtained by the Receiver came from the Levine
home.

[5]  On January 17, 2008, the Court entered an Order on Plaintiff's Ex Parte Motion for
Emergency Relief and Application for Order to Show Cause Why Defendants Should Not Be
Held in Civil Contempt.  (DE 227).  In this order, the Court appointed Daniel Newman to be
a temporary receiver ("Receiver") over Wire to Wire, Inc. ("Wire to Wire"), Public Highway,
Inc. ("Public Highway"), The Delaware Escrow Company ("Delaware Escrow") and Euro
Escrow (collectively, the "Receivership Entities").

computer at the Levine house. While the Levines were not, on paper, officers or directors of Delaware Escrow, they were the ones who actually ran the company on a day-to-day basis. Metz, who was ostensibly the sole officer and director of Delaware Escrow, admitted that for most of 2007, she was far too busy with her other businesses to conduct the work of Delaware Escrow. Instead, her mother did the work. And the only evidence presented to this Court of Delaware Escrow's communications with the Seller's Agents were all to or from Mrs. Levine. Metz was not even copied on the communications. And the only actual escrow agreement admitted into evidence was signed by Mrs. Levine, although she signed her daughter's name. (Pl. Ex. 153).

26. From the outset, the Levines controlled Delaware Escrow. Metz stated that she purchased Delaware Escrow, but the evidence does not fully back up this contention. In reality, it was Mr. Levine who brought Delaware Escrow to Metz, brokering the purchase from an old friend of his. Metz had no prior experience running an escrow company. She admitted she only purchased the company after Mr. Levine assured her it was a "good deal." (3/12/08 Tr. at 131). And, far from being intimately involved in the purchase process, Metz is not even sure she ever talked to the person who sold her the company about the terms of the sale.

27. As has been noted, *supra*, Mrs. Levine admitted signing her daughter's name to documents and checks. In fact, Mrs. Levine has access to an electronic signature of Metz. Thus, Mrs. Levine could affix Metz's electronic signature to any electronic document, then print it out, and it would be impossible to determine if Metz authorized, or was even aware of, her signature being attached in that manner.

13

28.  Delaware Escrow funds were used to support the Levines' lifestyle, not

Metz's.  The examples are numerous.  In 2007, Delaware Escrow paid for:

a)  The mortgage on the Levines' home at 8280 Gila Bend Way, Las Vegas, Nevada;

b)  Part of the mortgage at the Levines' former home at 5204 Coral Glow in Las Vegas, because Mrs. Levine had promised her niece, who purchased the former home, to help pay for the mortgage;

c)  The landscaper at the Levine home;

d)  The utilities at the Levine home;

e)  The Levines' medical expense;

f)  The Levines' car insurance; and

g)  Numerous withdrawals at cash machines located at the Levines' favorite casino, both in the form of debits from Delaware Escrow's bank account, and by paying for Levine credit cards used to withdraw cash.

29.  In short, Delaware Escrow funds were used to support the Levines' lifestyle,

and corporate formalities were not followed.

30.  Delaware Escrow was, throughout 2007, ostensibly an escrow company

for securities transactions.  Mrs. Levine did the work for Delaware Escrow.  Mrs. Levine

acknowledged this in her direct testimony, as did Metz in her direct testimony.

31.  Mrs. Levine, via Delaware Escrow, completed securities transactions by

sending the investor a securities purchase agreement and, after receiving the money from

the investor, sending the investor the share certificate.  Yet Mrs. Levine was not a

licensed escrow agent, nor was Delaware Escrow licensed to act as an escrow company

in Nevada.  In fact, it was not licensed to do any work in Nevada at all.  Nobody even

bothered to apply for a general business license on behalf of Delaware Escrow.  Nor did

anyone disclose to the investors that their money was being collected by an unlicensed

escrow company. And, of course, Delaware Escrow never disclosed to any investor that the person doing the work, Mrs. Levine, had been found liable for securities fraud, and had been enjoined from violating the antifraud provisions of the federal securities laws.

32.  Delaware Escrow's lack of a business license was not the only way it failed to obey corporate governance provisions.  It also commingled funds.  Delaware Escrow put monies from one issuer in an account with funds from other issuers, and it also commingled escrow funds into its general operating account.  The commingling of funds was not disclosed to the investors.  Mrs. Levine occasionally withdrew those commingled funds from cash machines at casinos.

33.  Furthermore, it was the testimony of the Receiver that, in his review of all of its records, Delaware Escrow kept no written escrow agreement for the issuers for which it acted as escrow agent in 2007.  Mrs. Levine testified that she believed there were such written contracts, although she did not see them when she reviewed the documents that the Receiver took from her home, and she did not introduce any such agreements during the four-day hearing.  To the extent that there is a conflict between these two witnesses, the Court, having had the opportunity to observe each witness's demeanor, and having noted whether the witness's testimony was supported by documentary evidence, credits the testimony of the Receiver as credible, and discounts that of Mrs. Levine as being not credible.

34.  Moreover, Delaware Escrow remitted commissions in excess of 80% to the Seller's Agents for Green Machine Development Corp. Delaware Escrow did not disclose the fact that the Seller's Agent received over four times as much as the Seller, that is, the entity who owned the shares prior to the sale.  Likewise, Delaware Escrow did

not disclose to the purchasers the amount of commissions that the Seller's Agents received for the sale of shares of Biomaxx.  In fact, in the spreadsheet that the Levines submitted to the Court, they also failed to break down how much the Seller's Agents received, and how much went to the entity that had owned the shares.

## EURO ESCROW

35. As with Delaware Escrow, Euro Escrow was a company supposedly under the control of Metz, who was its sole officer and director.  Again, regardless of the corporate setup, the evidence indicates that the Levines used Euro Escrow as their alter ego.  Euro Escrow's sole office was in the Levines' home.  Euro Escrow's papers were kept exclusively at the Levines' home.  Euro Escrow's electronic records were maintained, along with those of the other companies at issue in this matter, on a computer at the Levine house. Euro Escrow's checks were printed from that computer.  On occasion, Mrs. Levine would fill out and print Euro Escrow checks.

36.  While the Levines were not, on paper, officers or directors of Euro Escrow, they were the ones who actually ran the company on a day-to-day basis.  Metz, who was ostensibly the sole officer and director of Euro Escrow, admitted that throughout 2007, she was far too busy with her other businesses to conduct the work of Euro Escrow. Instead, Mrs. Levine did the work.  And, on at least one occasion, Mrs. Levine signed her daughter's name on behalf of Euro Escrow.  For example, Mrs. Levine filled out an account opening form for Euro Escrow's bank account at Bank of America.

37.  Again, as was the finding with respect to Delaware Escrow, this Court finds that the Levines used Euro Escrow to pay for their lifestyle.  From February 17 to August 22, 2007, Euro Escrow wrote fifteen checks to Marie Levine for a total of $34,000.  (Pl.

16

Ex. 80).  From February 26 to August 23, 2007, Euro Escrow wrote five checks to Gerald Levine for a total of $10,000. .  Euro Escrow also made numerous payments to pay the credit card bills of the Levines.  The credit cards had been used to obtain cash from machines located at a casino.

38.  There is no evidence that Euro Escrow was used to pay for Metz's lifestyle, even though she is the purported officer and director of the company.

39.  The Levines used Euro Escrow as an unlicensed escrow agent.  Euro Escrow was, throughout 2007, ostensibly a company that processed escrows.  According to Mrs. Levine, the work of Euro Escrow was "not really" different from that of Delaware Escrow.  The testimony of Metz was slightly different.  Despite having the word "Escrow" in its name, Metz claimed Euro Escrow was not really an escrow company because it was set up to do escrows for the sale of stock that it owned, as opposed to doing escrows for other companies.  Metz went to great lengths to distinguish the work of Euro Escrow from that of Delaware Escrow.  She explained that Euro Escrow did not receive funds from the sale of shares by other entities; rather, it received funds from investors who had purchased shares owned by Euro Escrow.  But Metz then said that, in fact, the shares that Euro Escrow sold were in reality owned by The 1975 Trust, the entity that, on paper, owns Euro Escrow.  Metz admitted that the shares owned by The 1975 Trust were never cancelled by the transfer agent and reissued to Euro Escrow.  As The 1975 Trust and Euro Escrow are two separate corporate entities, it is therefore undisputed that when Euro Escrow received investor funds and sent out share certificates to complete the sale of the shares owned by The 1975 Trust, it acted as the escrow agent for The 1975 Trust, exactly and precisely as did Delaware Escrow when it served as the escrow agent for the sale of shares of several issuers.

40.   Metz and Mrs. Levine did not hold Euro Escrow out as an escrow agent to governmental authorities and banks where Euro Escrow did business.  On its Las Vegas business license application, Metz wrote "we will not be providing escrow services."  (Pl. Ex. 169).  And Mrs. Levine wrote in Euro Escrow's bank account opening form "The company is selling it's own stock to raise money for working capital.  [sic]  We pay a stock broker overseas for his commission."  (Pl. Ex. 168; 3/11/08 Tr. at 188-189).  But the fact that Euro Escrow held itself out to the government and to its bank as something other than an escrow agent does not negate the fact that it did, in fact, act as an escrow agent.  And Mrs. Levine herself admitted as much at one point.  The Court asked her whether Delaware Escrow and Euro Escrow do different things, to which she replied, "Not really, no."  (3/11/08 Tr. at 51).

41.   Furthermore, there is unrefuted evidence that Euro Escrow received hundreds of thousands of dollars in investor funds from Public Highway.  (Pl. Ex. 62) ($290,000 in checks to Euro Escrow from Public Highway); (3/11/08 Tr. at 147-148).  Public Highway had received those funds as escrow agent for securities transactions.  (Pl. Ex. 159).  It is totally illogical to state that investor funds magically change into non-investor funds by virtue of having been transferred from one account to another, especially when, as is the case here, those accounts are controlled by the same people.  Even if this Court accepted the specious argument that Euro Escrow did not act as an escrow agent when it completed the stock sales for The 1975 Trust, it would find that Euro Escrow acted as an escrow agent when it received investor funds from Public Highway.  Either way, Euro Escrow acted as an escrow agent.

42.  It is undisputed that Euro Escrow does not have a license to act as an escrow agent.  Mrs. Levine acknowledged that Euro Escrow is not licensed to receive funds. Metz stated that she did not believe Euro Escrow needed a license to act as an escrow agent, although she was unable to articulate what her belief was based on.  The Receiver testified that he saw no licenses displayed at the Levines' house, where Euro Escrow's actual work was done.  The only license he found for Euro Escrow was a general occupancy license at 601 S. 10th Street, a location that the Levines admit was only used by Euro Escrow to receive mail.

43.  As was the situation with Delaware Escrow, Euro Escrow commingled investor funds.  And the Levines and Metz did not observe corporate formalities.

III.     **THE LEVINES RECEIVED SUBSTANTIAL SUMS FROM THE RECEIVERSHIP ENTITIES**

44.  Adding up the checks written in 2007 to Gerald or Marie Levine from Wire to Wire, Public Highway, Delaware Escrow and Euro Escrow, the Court finds that the Levines directly received at least $131,000 from these four entities.[6]  The Court finds that in addition to the direct payments, the Levines benefitted from payments by Public Highway, Euro Escrow and Delaware Escrow to Levine-held credit cards, which the Levines had used solely to obtain cash.  Moreover, as it is not in dispute that the Levines are the sole officers and directors of Wire to Wire and Public Highway, the Court finds

---

[6]     To arrive at this figure, the Court added up the checks in Plaintiff's Exhibits 75, 79, 80 and 89, plus the $66,000 in transfers to Marie Levine indicated in the Wire to Wire Balance Sheet Detail found on pages 32-35 in Plaintiff's Exhibit 151.

that it is appropriate to add to the total figure the $56,000 from checks written to cash from Wire to Wire or Public Highway's accounts.[7]

45.   The Court also finds that the Levines used all four Receivership Entities as their personal source of financing.  They did not treat any of the Receivership Entities differently from the others.  Each of the Receivership Entities paid for all manner of Levine personal expenses, and the Levines moved money among the Receivership Entities at will.  In a telling exchange, counsel for the Commission asked Mrs. Levine whether Delaware Escrow paid for part of the mortgage at the Levines' former residence. Mrs. Levine responded, "Yes, *because Wire to Wire wasn't able to make the payments*." (3/11/08 Tr. at 58, emphasis added); (*see also* 3/11/08 Tr. at 115-116) (Mrs. Levine admits that Delaware Escrow paid some Levine bills because Wire to Wire did not have the funds available).  Mrs. Levine clearly saw Delaware Escrow as no different from Wire to Wire, which this Court already found was her alter ego.  Thus, it is clear these entities were used for whatever purposes the Levines desired.

---

[7]    To arrive at this figure, the Court added up the checks in Plaintiff's Exhibits 76 and 88.

## CONCLUSIONS OF LAW

### STANDARD FOR CIVIL CONTEMPT

1. A district court has both inherent and statutory power to enforce compliance with its orders through the remedy of civil contempt. *Sillitani v. United States*, 384 U.S. 364, 370 (1966); *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000); 18 U.S.C. § 401 (statutory authority for civil contempt).  "A party is in contempt of court when he 'violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order.'" *Bilzerian*, 112 F. Supp. 2d at 16 (citations omitted).

2. For the Court to hold the Levines in contempt of the Order of Judgment, the Commission must show by clear and convincing evidence that (1) the Court's order regarding the injunction against future securities law violations was "reasonably clear and specific;" and (2) the Levines failed to comply with its terms. *Lee v. Department of Justice*, 401 F. Supp. 2d 123, 131 (D.D.C. 2005) (citations omitted).

3. The Court need not find that the violations of the injunction were "willful or intentional." *SEC v. Bankers Alliance Corp.*, 881 F. Supp. 673, 678 (D.D.C. 1995); *see also SEC v. Universal Express, Inc.*, 2007 WL 2469452, at *3 (S.D.N.Y. Aug. 31, 2007) (discussing standard for contempt for violation of an injunction in a SEC case).

### THE LEVINES' VIOLATION OF THE SECURITIES LAWS

4. The standards for determining whether a defendant violated Section 17(a) of the Securities Act, [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], are well settled.

5.   To prove a violation of Section 10(b) of the Exchange Act and Rule 10b-5, the Commission must show that: (1) the defendant made an untrue statement of material fact or omitted a fact that rendered a statement made by the defendant materially misleading; (2) such misrepresentation or omission was made in connection with the purchase or sale of securities; and (3) was done with the intent to mislead (scienter).  *Ernst & Ernst v. Hockfelder*, 425 U.S. 185, 195 (1976).  Proving a violation of Section 17(a) of the Securities Act requires essentially the same showing, but in the offer or sale, rather than in connection with the purchase or sale, of a security.[8]

6.   Congress intended that courts construe antifraud securities legislation "not technically and restrictively, but flexibly to effectuate its purpose."  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) (footnote and internal quotations omitted).  "A fundamental purpose, common to [securities antifraud] statutes, was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."  *Id.* at 186.

7.   The defendants' conduct, weighed against these standards, clearly demonstrates that they violated the Court's § 17(a) and § 10(b) injunctions.

## I.      THE LEVINES' UNTRUE STATEMENTS OR OMISSIONS OF MATERIAL FACTS.

8.   After the § 17(a) and § 10(b) injunctions were issued in this case, the Levines made numerous materially untrue statements or omissions of material facts: (1) they failed to disclose that they had been found liable for securities fraud violations; (2) they failed to disclose that the companies they were using as escrow agents were not licensed

---

[8]     *See SEC v. Huttoe*, 1998 WL 34078092 at *3-4 (D.D.C. Sept. 14, 1998) (analyzing § 17(a) and § 10(b) claims together); *see also SEC v. Berger*, 244 F. Supp. 2d 180, 188-189 (S.D.N.Y. 2001) ("the standard for a violation of Section 17(a) is 'essentially the same'" as the one for a violation of Section 10(b)).

to do so; (3) they failed to disclose the excessive commissions they sent to the sales agents; and (4) they failed to disclose that the funds the investors were sending in were commingled with funds from investors in different companies, and with general operating funds.

9.   First, the Levines violated § 17(a) and §10(b) by omitting to disclose to investors their having been found liable for violating the federal securities laws.  Mrs. Levine admitted that she was the individual responsible for sending investors paperwork related to various stock offerings.  (3/11/08 Tr. at 192).  The paperwork that Mrs. Levine sent to investors did not disclose that the Levines had previously been found liable in this Court for securities fraud.  (*See, e.g.,* Pl. Exs. 159, 160) (Stock Purchase Applications sent by Mrs. Levine).

10.   Courts generally consider a statement or omission to be material if "a reasonable man would attach importance in determining his choice of action in the transaction in question."  *SEC v. General Refractories Co.*, 400 F. Supp. 1248, 1257 (D.D.C. 1975); *see also TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining the "general standard of materiality" that promotes the "protection of investors").

11.   It cannot be disputed that a reasonable investor would want to know whether the person they are sending their money to in order to purchase a stock has been previously found to have violated the securities laws.  *See, e.g., SEC v. Kirkland*, 2007 WL 3119395 at *15 (M.D. Fla. Sept. 25, 2007) (information regarding a person's prior disciplinary history would assist investors in judging a defendant's "veracity and whether [the] businesses were legitimate and sound"); *SEC v. Merchant Capital, LLC*,  483 F. 3d

747, 771-772 (11th Cir. 2007) (holding that it was clear error for a district court to not

count as a material misrepresentation a defendant's failure to disclose a state cease and

desist order relating to a similar investment product); *SEC v. Physicians Guardian Unit*

*Inv. Trust*, 72 F. Supp. 2d 1342, 1351 (M.D. Fla.1999) (allegation that promoter failed to

disclose existence of state cease and desist order supported securities fraud claim); *SEC*

*v. Paro*, 468 F. Supp. 635, 646 (N.D.N.Y. 1979) (material omission when defendant

failed to disclose cease and desist orders entered by federal and state courts against

similar predecessor interests); *Breard v. Sachnoff & Weaver, Ltd.*, 941 F. 2d 142, 143-44

(2d Cir. 1991) (failure to disclose that key financier and guarantor had pled guilty to

fraud in connection with similar scheme, if proven, was material).  Thus, the Court

concludes the Levines' failure to disclose their previous violation of the securities law

was a material omission.

12.  Second, the Levines violated § 17(a) and §10(b) by omitting to disclose

the escrow companies that were receiving investor funds were not licensed to do so, as

required by law.  At the contempt hearing, the Levines claimed that their involvement in

the sale of securities was limited to acting as "escrow agents."  (2/20/08 Tr. at 146, 149-

150).  They claimed the escrow companies received 2% of the investor funds collected

for the work they performed.  (DE 230 at 4).[9]  The evidence at the hearing demonstrated

that the Levines used Public Highway and Delaware Escrow to receive investor funds.

---

[9]    The Court notes that the 2% claim appears to be inaccurate.  The amount of money
dispursed by the Receivership Entities in 2007 to the Levines, either directly or
indirectly, greatly exceeds 2% of what the Levines' accounting claimed was collected
from investors.  (DE 230 at 8-24); (3/13/08 Tr. at 63-65) (Receiver testifying regarding
funds belonging to Receivership Entities that were used for the Levines' benefit);
(3/12/08 Tr at 9-16) (Mrs. Levine testifying regarding amounts received from investors).

(2/20/08 Tr. at 156).[10]  All of the work done on behalf of Public Highway and Delaware Escrow was done in the State of Nevada – out of the Levines' home.  (2/20/08 Tr. at 77; 3/11/08 Tr. at 56-57).[11]

13.  Under Nevada law, an "escrow agent" is "any person engaged in the business of administering escrows for compensation."  Nevada Revised Statutes 645A.010(5).  "It is unlawful for any person, . . . , to engage in or carry on, or hold himself out as engaging in or carrying on, the escrow business or act in the capacity of an escrow agent or agency without first obtaining a license as an escrow agent or agency."  Nevada Revised Statutes 645A.210.

14.  Public Highway was not even licensed to engage in any business in the State of Nevada – much less licensed to do escrow work pursuant to Nevada law.  (3/11/08 Tr. at 178).  Likewise, Delaware Escrow does not have an escrow license in Nevada. (3/11/08 Tr. at 177-178).

15.  Investors were not informed that the companies receiving their funds (Public Highway and Delaware Escrow) were not licensed by the State of Nevada to engage in escrow services.  *See* Nevada Revised Statutes 645A.010 *et seq.* (escrow agents must be licensed in Nevada).  Surely, a reasonable investor would want to know that the "escrow

---

[10]  The evidence also showed that Public Highway would then transfer large sums to Euro Escrow.  (3/11/08 Tr. at 147-148) (Pl. Ex. 62) (transfer of $290,000 from Public Highway to Euro Escrow).

[11]  At the hearing, the Levines attempted to argue that they did not violate Nevada law because they thought Delaware Escrow was permitted to do "escrow work" in Florida. (3/12/08 Tr. at 52).  Aside from being legally without merit, such an argument is factually nonsensical because Mrs. Levine did all the work for Delaware Escrow out of her home in Nevada.

agent" he/she is sending their money to is not even licensed to be engaged in that type of business activity. *See, e.g., TIG Ins. Co. v. Reliable Research Company*, 334 F.3d 630, 636 (7th Cir. 2003) (escrow agent's failure to disclose existence of permanent injunction barring it from engaging in unauthorized practice of law was a material misrepresentation that supported the rescission of an insurance policy); *SEC v. Randy*, 38 F. Supp. 2d 657, 669 (N.D. Ill. 1999) (fact that bank whose securities were being sold was not legally licensed was material); *SEC v. Howard J. Hansen*, 1984 WL 2413, at *7 (S.D.N.Y. Apr. 6, 1984) (existence of state securities law violations, including of unlicensed salespeople, "is a material fact whose omission may well have misled investors.").

16. Consequently, the Court concludes that the Levines violated this Court's § 17(a) and § 10(b) injunctions by engaging in an illegal escrow business in connection with the offer or sale of securities.

17. Third the Levines violated § 17(a) and §10(b) by omitting to disclose the excessive commissions that the Levines sent to the Seller's Agents. Paperwork that Mrs. Levine sent investors did not disclose any commission figures whatsoever. (3/11/08 Tr. at 205) (Pl. Exs. 159, 160) (Securities Purchase Applications). It was clear from the documents and testimony that the Seller's Agents were receiving commissions of over 75%. (3/11/08 Tr. at 205). This is a fact that was known to the Levines and not disclosed to investors. Indeed, the Seller's Agents' role is not revealed at all on any of the paperwork sent to investors by Mrs. Levine. At the hearing, Mrs. Levine claimed that she disbursed funds to the Seller's Agents and Seller pursuant to the instructions contained in an "escrow agreement." The Levines, however, did not introduce into evidence any "escrow agreement" relating to the sale of shares of Evolution Global

26

Capital Partners, Inc., Biomaxx Systems, Inc., Avitech LifeSciences, Inc., Green

Machine Development Corp., Xiiva Holdings, Inc., Savior Energy Corp., or Magellan

Energy, Ltd.[12]  *See Roemelmeyer v. Vidana*, 19 B.R. 787, 788 (S.D. Fla. 1982) ("The

failure of a party to provide evidence peculiarly available to that party supports the

inference that the truth would be damaging to the party.") (citations omitted).  And the

Receiver appointed in this case testified that he has been unable to locate one.  (3/13/08

Tr. at 73-74).[13]

18.  As one court has noted: "***the disclosures of commissions and other***

***compensation is fundamental to securities laws***."  *SEC v. Alliance Leasing Corp.*, 2000

WL 35612001, at *8-9 (S.D. Cal. Mar. 20, 2000) (emphasis added).  The *Alliance*

*Leasing* court found that "in unregistered securities offerings, it is industry practice to

disclose the amount of commissions paid as part of the sales effort."  *Id.*  And the

*Alliance Leasing* court held that as a matter of law a "thirty percent" commission figure

was "one that most reasonable investors would deem material in determining whether to

invest.  Hence, failure to disclose this sum misrepresents the investor's potential profit."

*Id.*

---

[12]   Mrs. Levine testified that she did not encounter any escrow agreements for these issuers when she reviewed the documents taken by the Receiver.  Her excuse, which the Court finds wholly unpersuasive, was that she was not looking for them.  (3/12/08 Tr. at 6).

[13]   An escrow agreement (for a different stock) was introduced into evidence by the Commission that demonstrated the owner of the shares would receive $1.01 per share sold, regardless of the price paid by the purchaser, while the "Seller's Agent" was to receive the balance of investor funds, less administrative fees and the 2% paid to the escrow agent.  (Pl. Ex. 153).  Wire transfers for two of the stocks at issue in this contempt hearing are consistent with the "Seller's Agent" receiving around 80% of investor funds.  (3/11/08 Tr. at 205) (Pl. Ex. 155).

19. Just like in *Alliance Leasing*, there should be no doubt that the Levines'
failure to disclose the agents' commissions of over 75% was also a material
misrepresentation.  *See also id.* (The Court holds that "exorbitant commission fees of 30
cents on every dollar invested are clearly material to an investor's assessment of the
strength of a potential investment."); *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d
184, 189-90 (2d Cir. 1998) (10b-5 fraud is committed by "charging customers excessive
markups without proper disclosure."); *SEC v. Feminella*, 947 F. Supp. 722, 729
(S.D.N.Y. 1996) ("where a defendant 'exacts unreasonable profits resulting from a price
which bears no reasonable relation to the prevailing price' of the security, the anti-fraud
provisions of the Securities Act and the Exchange Act are violated.").

20. Fourth, the Levines violated § 17(a) and §10(b) by omitting to disclose that
the funds investors sent them would be commingled with funds from investors in other
companies, and with general operating funds.  Mrs. Levine conceded that when funds
from investors were received their money was commingled with other funds belonging to
Delaware Escrow and Public Highway.  Under Nevada law, "[a]ll money deposited in
escrow to be delivered upon the close of the escrow or upon any other contingency must
be kept separate from money belonging to the escrow agent or agency . . . ."  Nevada
Revised Statutes 645A.160.  In addition, "[t]he money when deposited must be
designated as 'trust funds' or 'escrow accounts' or under some other appropriate name
indicating that the money is not the money of the escrow agent or agency."  *Id.*

21.  Based on the foregoing analysis, the Court concludes that a reasonable
investor would consider the fact that investment funds were going to be commingled with

28

other funds – in direct violation of Nevada law – would be information the investor would want to have before making the decision to invest.[14]

22.   Simply put, after the § 17(a) and § 10(b) injunctions were issued in June 2007, the Levines made numerous untrue statements or omissions of material facts.

## II.   THE LEVINES' UNTRUE STATEMENTS OR OMISSIONS OF MATERIAL FACTS WERE MADE "IN CONNECTION WITH" THE PURCHASE OR SALE OF SECURITIES, OR IN THE OFFER OR SALE OF SECURITIES

23.   As noted above, in order for the Levines to be in contempt of the § 10(b) injunction, their material misstatements or omissions of material facts must have been made "in connection" with the purchase or sale of securities.   *Ernst & Ernst v. Hockfelder*, 425 U.S. 185, 195 (1976).   The Supreme Court has held that the "in connection with" element is a broad and flexible standard and that any activity "touching [the] sale of securities" will suffice.   *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971).   The standard for violating § 17(a) is the same, when the material misstatement or omission of material facts is in the offer or sale of securities. *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490 (S.D.N.Y. 2002).

---

[14] The Levines, acting through Public Highway and Delaware Escrow, violated multiple other provisions of Nevada law on escrow agents.   For example, an escrow agent in Nevada can only be associated with "one escrow agency at the same time."   Nevada Revised Statutes 645A.032(2).   Clearly, Mrs. Levine did work on behalf of Public Highway and Delaware Escrow at the same time.   In Nevada, an escrow agent cannot do work in the same location as other businesses.   Nevada Revised Statutes 645A.037(1).   It was clear from the testimony that the Levines ran businesses such as Wire to Wire's and Public Highway's "consulting" out of their home while conducting "escrow work."   In addition, Delaware Escrow used an office suite as a "mail drop."   (3/11/08 Tr. at 63). This office suite was used by MaryAnn Metz to conduct business for a judgment recovery business and a cable installation business.   (3/13/08 Tr. at 27, 71).   Lastly, escrow agents in Nevada must be bonded.   Nevada Revised Statutes 645A.041.   There was no evidence that any of the companies the Levines are associated with was bonded to do escrow work.   (3/13/08 Tr. at 71).

24.   Mrs. Levine conceded that she was involved in sending investors paperwork relating to securities on behalf of both Public Highway and Delaware Escrow.  Given this concession and the broad standard for the "in connection with" element, the Court concludes this element of § 17(a) and § 10(b) is met.

## III.      THE LEVINES ACTED WITH THE INTENT TO MISLEAD

25.   Courts have defined "scienter" under § 10(b) as a state of mind embracing intent to deceive, manipulate or defraud.  *Ernst & Ernst v. Hockfelder*, 425 U.S. 185, 193 (1976).  In this circuit, if false statements were made recklessly as to their falsity, the scienter element of § 10(b) is met.  *Dolphin and Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008).

26.   The evidence adduced at the contempt hearing clearly showed that the Levines acted with the highest degree of scienter.  As noted above, the Court has already found the Levines in contempt for failure to pay the judgment entered against them.  In so doing, this Court noted that "[t]he Levines are as contemptuous as any persons who have appeared before this court."  (3/13/08 Tr. at 162).  In addition, the Levines completely lack credibility.  They clearly knew that they had been found liable for violating the securities laws and they willfully chose not to disclose this fact to investors.

27.   The Levines also must have known that escrow companies need to be licensed in Nevada because their daughter filled out an application for a business license for Euro Escrow and represented that Euro Escrow was not an escrow agency.  (Pl. Ex. 168).  Thus, the Levines willfully chose not to attempt to obtain an escrow license for either Public Highway or Delaware Escrow.

28.   Finally, the Levines knew about the excessive commissions being paid to the Seller's Agents and the questionable business practices of the Seller's Agents.  (Pl. Exs. 160-164) (complaint letters from investors to Delaware Escrow, sent to the Levines' home).[15]  But the Levines continued to do business with these entities.[16]

29.   Consequently, the Levines acted with intent to mislead and the Court concludes they violated the § 17(a) and § 10(b) injunctions.

## IV.      THE LEVINES ARE THE ALTER EGOS OF WIRE TO WIRE, PUBLIC HIGHWAY, DELAWARE ESCROW AND EURO ESCROW

30.   When the Court issued its Show Cause Order on January 17, 2008, the Court appointed Daniel Newman, Esq., as a temporary receiver over the affairs of Wire to Wire, Public Highway, Delaware Escrow and Euro Escrow.  If these entities are the alter egos of the Levines, the Court continues to have jurisdiction over them.  *Select Creations, Inc. v. Paliafito America, Inc.*, 852 F. Supp. 740, 774 (E.D. Wisc. 1994) (citing cases).

31.   When the Court found the Levines in contempt of court for failure to pay the judgment, the Court noted that it "does not believe that it is required to honor the way in

---

[15]   The Levines have been sued by the Commission in another matter, *SEC v. Gerald Harold Levine, et al.*, 2:07-CV-00506 LDG/RJJ (D. Nev.).  That Complaint alleges the Levines were involved with "boiler rooms" in Spain that sold securities to investors in Europe.  (*See also* DE 221 at ¶¶ 113-114).

[16]   The Court notes that the Seller's Agents – Amaryla, Aura Trading and Bluntl United – use bank accounts in Switzerland and Cyprus, and they all contacted Mrs. Levine from the same email address.  This same email address was also used by an entity called Hogarth, Inc. who is allegedly the Seller of the securities.  Interestingly, none of these entities has appeared in this matter to make a claim to the frozen funds, even though, according to Mrs. Levine, the money the Court froze in January 2008 was from sales of shares that these entities brokered.  (3/11/08 Tr. at 15-16).

which the Levines have structured their financial affairs in determining whether they are in contempt of court." (3/13/08 Tr. at 162-163). This is also true in determining whether the Levines are in contempt of court for failure to abide by the § 17 (a) and § 10(b) injunctions.

32. The evidence adduced at the contempt hearing demonstrated over and over again that the Levines act through corporate entities that they control. The Commission contends that the Levines are the alter egos of Wire to Wire, Public Highway, Delaware Escrow and Euro Escrow. The Court agrees.

### A. The Levines Are the Alter Ego of Wire to Wire

33. In the May 2007 Memorandum Opinion, the Court found that Gerald and Marie Levine are the sole officers and directors of Wire to Wire. (DE 221 at ¶ 23). As such, they control the bank accounts of Wire to Wire. *Id.* At that time, this Court also found that "only the Levines control [Wire to Wire], and at all times relevant to this suit, they did so without respecting corporate formalities." (DE 221 at ¶ 33). This Court also held that "Wire to Wire was the vehicle through which defendants perpetrated and profited from their fraud." *Id.* at ¶ 34.

34. The evidence introduced at the contempt hearing further demonstrated that the Levines use Wire to Wire as their personal piggy bank. For example, there were tens of thousands of dollars in checks from Wire to Wire to the Levines. (Pl. Ex. 151 (pp. 32-35); (Pl. Ex. 89). There were also thousands of dollars of checks to cash for which the Levines could not credibly account. (Pl. Exs. 76, 88). Wire to Wire (along with Public Highway, Delaware Escrow, and Euro Escrow) is run out of the Levines' residence. (2/20/08 Tr. at 77; 3/12/08 Tr. at 177). All of Wire to Wire's computer files were stored

on the same computer (in Gerald and Marie Levine's bedroom) that contained the files of Public Highway, Delaware Escrow and Euro Escrow.  (3/12/08 Tr. at 27).

35.  Because Wire to Wire is incorporated in Nevada, Nevada law controls the alter ego analysis.  *See* RESTATEMENT (SECOND) CONFLICTS OF LAWS § 307 ("The local law of the state of incorporation" governs the piercing the corporate veil analysis); *see also Paliafito*, 852 F. Supp. at 774.  To establish the existence of an alter ego relationship, the following must be established:  (1) the corporation was *influenced and governed* by the person asserted to be the alter ego; (2) there is such *unity of interest* and *ownership* that one is inseparable from the other; and (3) adherence to the corporate fiction of a separate entity would, under the circumstances, sanction *fraud* or promote *injustice*.  *See* Nevada Revised Statute §78.747 (2001).

36.  As the court recognized in *Mallard Automotive Group v. Leclair Mgt. Corp., et al.*, 153 F. Supp. 2d 1211, 1216 (D. Nev. 2001), "if the government is able to establish the first two elements of alter ego, then evidence exists that would demonstrate that adherence to the corporate fiction would promote a fraud or injustice."  *See also LFC Marketing Group Inc. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000).  As the Court recognized in its May 2007 Memorandum Opinion and the evidence adduced at the contempt hearing further makes clear, there is no evidence that anyone but the Levines controls Wire to Wire.

37.  In addition, adherence to the corporate fiction of Wire to Wire would, under the circumstances, support a fraud because the Levines use Wire to Wire to fund their personal lifestyle.  Consequently, the Court concludes that the Levines are the alter ego of Wire to Wire.

### B.  The Levines Are the Alter Ego of Public Highway

38.  Public Highway is another company the Levines used to perpetrate their fraud.  As noted above, Public Highway received hundreds of thousands of dollars from investors.  Mrs. Levine conceded that Public Highway received these funds because it was acting as an "escrow agent."  (2/20/08 Tr. at 153-154; 3/11/08 Tr. at 178).  It is clear, however, that Public Highway does not have a license to engage in escrow work in Nevada.

39.  The sole officers and directors of Public Highway are the Levines.  (2/20/08 Tr. at 73-74, 144-145; 3/11/08 Tr. at 178).  The Levines are also signatories on the bank accounts of Public Highway.  (2/20/08 Tr. at 55; Pl. Exs. 75, 76).  Public Highway's only offices are located in the Levines' residence.  (2/20/08 Tr. at 77; 3/11/08 Tr. at 62-63).  And Public Highway's computer files are maintained on the same computer as the files of Delaware Escrow, Euro Escrow and Wire to Wire.

40.  These facts are extremely relevant to the alter ego analysis.  *See, e.g., Freeman v. Complex Computing Company, Inc.*, 119 F.3d 1044, 1053 (7th Cir. 1997) (holding that "common office space" and "address" are a factor in alter ego analysis); *SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 236 (D. Nev. 1985) (finding alter ego where companies shared addresses and intermingled funds); *Chicago District Council of Carpenters Pension Fund v. P.M.Q.T., Inc.*, 169 F.R.D. 336, 344 (N.D. Ill. 1996) (alter ego found where both companies operated out of the same office space in a defendant's home and shared computer equipment).[17]

---

[17]  *See also N.L.R.B. v. M&V Painting, Inc.*, 2001 WL 1829517, *4 (E.D. Mich. June 15, 2001) ("Although the same location and business purpose do not, by themselves,

41.   During the 2008 show cause hearing, the Commission introduced into evidence thousands of dollars in checks written from the accounts of Public Highway to the Levines.  (Pl. Exs. 74, 75).  Likewise, there were thousands of dollars in checks to "cash" for which the Levines could not properly account.  (Pl. Ex. 76) (3/11/08 Tr. at 34-36).  There were also transfers of $340,000 to the accounts of Delaware Escrow and Euro Escrow.  (3/11/08 Tr. at 146-148) (Pl. Exs. 61, 62).  Mrs. Levine claimed these transfers were made because there was an agreement that these funds would be transferred to the Sellers and Seller's Agents in Europe "either from Euro Escrow or Delaware Escrow." (3/12/08 Tr. at 44-45).  However, no such agreement was introduced into evidence at the hearing.  And evidence was introduced that Public Highway also transferred sums to the Sellers and Seller's Agents in Europe.  (Pl. Ex. 77); (3/13/08 Tr. at 19) (Metz testifying that Public Highway sent funds to a bank in Cyprus in the name of Aura Trading Limited on June 5, 2007).  These inconsistencies cast even more doubt on Mrs. Levine's credibility.

42.   There can be no doubt that, like they do with Wire to Wire, the Levines use Public Highway to pay for all manner of their personal expenses.  In short, the Levines control Public Highway and it is undoubtedly their alter ego.

### C.  The Levines Are the Alter Ego of Delaware Escrow

43.  Delaware Escrow is no different than Wire to Wire or Public Highway.  It is a privately held company incorporated in Delaware, which employs a similar alter-ego

---

establish that [an entity] is an alter ego, they clearly provide support for that conclusion.").

analysis to Nevada.  *See, e.g., Mason v. Network of Wilmington, Inc.*, 2005 Del. Ch.
LEXIS 99, *9 (Del. Ch. 2005).  Metz purported to purchase Delaware Escrow from the
Levines' friend, L. Van Stillman in September 2005.  (Pl. Ex. 4) (3/11/08 Tr. at 49).
Metz testified that she bought Delaware Escrow after being assured by Gerald Levine
"that it was a good deal."  (3/12/08 Tr. at 131).  Metz admitted she was not even sure that
she ever even talked to Van Stillman before making the purchase.  (3/12/08 Tr. at 177).

44.   Delaware Escrow was also run out of the Levines home and shared the same
computer referenced above.  (3/11/08 Tr. at 56-57, 62-64; 3/12/08 Tr. at 177).  And Metz
admitted that her mother had been running the day-to-day functions of Delaware Escrow
since March 2007.  (3/12/08 Tr. at 185).

45.   As noted in the findings of fact, Delaware Escrow paid all manner of the
Levines' personal expenses including mortgages, lawn service, utility bills, medical
expenses, and car insurance.  Mrs. Levine was also able to use funds belonging to
Delaware Escrow to pay for gambling in casinos.  (Pl. Exs. 180, 181, 182, 183, 184)
(payments to Capital One for withdrawals made by Mrs. Levine in casinos); (3/11/08 Tr.
at 165) ("Q:  And you also make cash withdrawals from the debit card for Delaware
Escrow at casinos?  A:  Sometimes, I did, yes.").

46.   At the hearing, the Levines and Metz contended that because the Levines are
not officially listed as officers or directors of Delaware Escrow they cannot be its alter
ego.  This exact argument was rejected by the Second Circuit in *Freeman v. Complex
Computing Company*, 119 F.3d 1044, 1051-52 (2d Cir. 1997).  In *Freeman*, a defendant
claimed he was not the alter ego of an entity because he was not "a shareholder, officer,
director or employee."  *Id.*  The Second Circuit, however, rejected this argument and held

36

that a defendant can be deemed an "equitable owner" of an entity "notwithstanding the fact that the individual is not a shareholder of the corporation." *Id.*

47. The *Freeman* court found that the defendant was an "equitable owner" of an entity because both the entity's and his office were located at his residence, the defendant received payments from the entity, and the defendant controlled the actions of the entity. *See Vidana*, 19 B.R. at 788 (concluding that funds ostensibly in the possession of a daughter actually belonged to the father because the daughter was "merely [the father's] alter ego or a straw man" used to hide funds); *In re D.H. Overmeyer Telecasting Co., Inc.*, 53 B.R. 963, 982-984 (N.D. Ohio 1984) (finding that companies were "merely the alter ego of [debtor] and were used as a front or mere conduit by him to carry out his fraudulent scheme.").

48. The same is true here. Given the facts established at the hearing, the Court draws the inference that Metz was nothing more than a front for the Levines use of Delaware Escrow.

49. Simply put, Delaware Escrow is the alter ego of the Levines and its affairs were intertwined with those of Wire to Wire, Public Highway, and Euro Escrow.

**D. The Levines Are the Alter Ego of Euro Escrow**

50. Euro Escrow, like Wire to Wire, Public Highway, and Delaware Escrow, is unquestionably an alter ego of the Levines.

51. As with Delaware Escrow, MaryAnn Metz is officially listed as the only officer and director of Euro Escrow. But this does not mean she actually controls Euro Escrow. *See Complex Computing Company*, 119 F.3d at 1051-52 (defendant can be an

"equitable owner" of a company "notwithstanding the fact that the individual is not a shareholder of the corporation").

52.   Euro Escrow was run out of the Levines' home and shared the exact same computer as Wire to Wire, Public Highway and Delaware Escrow.  (2/20/08 Tr. at 77-78; 3/11/08 Tr. at 62-64; 3/12/08 Tr. at 27, 77).   Euro Escrow paid all manner of the Levines' personal expenses including utitlities, mortgages, and credit card bills.  (Pl. Exs. 179-184) (3/11/08 Tr. at 92).   Likewise, checks were written to the Levines from the accounts of Euro Escrow.  (Pl. Exs. 79, 80).   The evidence introduced at the hearing demonstrates that funds purportedly belonging to Euro Escrow were used for whatever the Levines needed.

53.   Furthermore, Mrs. Levine was given permission to sign her daughter's name to documents relating to the business of Euro Escrow.  (Pl. Ex. 168) (3/11/08 Tr. at 131, 187).   Mrs. Levine also does the bookkeeping for Euro Escrow.  (3/11/08 Tr. at 127).

54.   In short, just like with the other entities, it is clear the Levines are the ones who control the activities of Euro Escrow.   As a result, the Court concludes that Euro Escrow is an alter ego of the Levines.

55.   The Court concludes that the Receivership Entities are treated the same by the Levines and Metz.   Each of them pay for all manner of the Levines' personal expenses, they continually transfer funds among each other, and they are all run out of the Levines' home, sharing the same computer.   In short, for each of the Receivership Entities, corporate formalities are not followed, and they all operate as the Levines' and each others' alter egos.   *See Northern Tankers (Cyprus) Ltd. v. Backstrom*, 967 F. Supp.

1391, 1408 (D. Conn. 1997) (finding alter ego were corporate formalities were "blatantly disregarded" and used to conduct the defendants' "personal business rather than their own corporate business").

## SANCTIONS

56.   The Levines failure to comply with the § 17(a) and § 10(b) injunctions entered against them is a harm of substantial magnitude, undermining the deterrent effect of Commission enforcement actions and the enforceability of court orders.

57.   Courts have wide discretion in fashioning remedial sanctions for civil contempt.  *U.S. v. Waksberg*, 1992 WL 237367, at *3 (D.D.C. July 28, 1992); *In the Matter of Dickinson*, 763 F.2d 84, 87 (2d Cir. 1985).  Civil contempt sanctions should either seek to coerce the contemnor into future compliance with the Court's order or compensate the complainant for losses resulting from the contemnor's past noncompliance.  *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1062 (2d Cir. 1995).  A sanction may be both coercive and compensatory.  *Landmark Legal Foundation v. EPA*, 272 F. Supp. 70, 76 (D.D.C. 2003); *New York State National Org. for Women v. Terry*, 866 F.2d 1339, 1353 (2d Cir. 1989).

58.   Federal courts have inherent equitable relief to issue a variety of "ancillary relief" measures in actions brought by the Commission to enforce the federal securities laws.  *SEC v. General Refractories Co.*, 400 F. Supp 1248, 1260 (D.D.C. 1975); *SEC v. Wencke*, 622 F. 3d 1363, 1369 (9th Cir. 1980); *Chris-Craft Industries Inc. v. Piper Aircraft Corp.* 480 F. 2d 371, 390-91 (2d Cir. 1973).  The Supreme Court has repeatedly emphasized the broad equitable powers of the district courts to shape equitable remedies

to the necessities of particular cases, especially where a federal agency seeks enforcement in the pubic interest. *Wencke*, 622 F.3d at 1371; *FTC v. Productive Marketing, Inc*. 136 F. Supp. 2d 1096, 1004-05 (C.D. Cal. 2001).

59.  In this case, the Court previously appointed a temporary receiver, Daniel Newman, Esq., to take control over the affairs of Wire to Wire, Public Highway, Delaware Escrow and Euro Escrow.  (DE 227, January 17, 2008 Order).

60.  Receivers are appointed so that they may take charge of a company to enforce compliance with regulatory laws.  *Morgan v. McDonough*, 540 F. 2d 527, 533 (1st Cir. 1976) *citing U.S. v. American Tobacco Co*. 221 U.S. 106, 186 (1911).

61.  As one court recently noted in an SEC enforcement action, "appointing a receiver is an extraordinary remedy" but when defendants continue "to violate court orders, and there is no one who is responsible, willing, and able to manage" a company in compliance with the federal securities laws, the appointment of a receiver is necessary. *SEC v. Universal Express, Inc.*, 2007 WL 2469452, at *12 (S.D.N.Y. Aug. 31, 2007).

62.  Such are the circumstances here.

> Henry H. Kennedy, Jr.
> United States District Judge